# [J-77A&B-2013]
## IN THE SUPREME COURT OF PENNSYLVANIA
### WESTERN DISTRICT

## CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

| | |
|---|---|
| DEPARTMENT OF ENVIRONMENTAL PROTECTION, | : No. 4 WAP 2013 |
| | : |
| | : Appeal from the Order of the |
| Appellant | : Commonwealth Court entered September |
| | : 20, 2011 at No. 495 CD 2010, affirming |
| | : the Order of Environmental Hearing Board |
| v. | : entered March 16, 2010 at Nos. 2009-068- |
| | : L, 2009-069-L, 2009-070-L, 2009-071-L, |
| | : 2009-072-L, 2009-082-L, 2009-139-L, |
| CUMBERLAND COAL RESOURCES, LP | : 2009-140-L. |
| AND AMFIRE MINING CO., LLC, | : |
| | : ARGUED: October 15, 2013 |
| Appellees | : |

| | |
|---|---|
| DEPARTMENT OF ENVIRONMENTAL PROTECTION, | : No. 5 WAP 2013 |
| | : |
| | : Appeal from the Order of the |
| Appellant | : Commonwealth Court entered September |
| | : 20, 2011 at No. 764 CD 2010, affirming |
| | : the Order of Environmental Hearing Board |
| v. | : entered March 30, 2010 at Nos. 2009-023- |
| | : L, 2009-040-L. |
| | : |
| EMERALD COAL RESOURCES, LP AND | : ARGUED: October 15, 2013 |
| CUMBERLAND COAL RESOURCES, LP, | : |
| | : |
| Appellees | : |
| | : |

## OPINION

**MADAME JUSTICE TODD**                    **DECIDED: SEPTEMBER 24, 2014**

In this appeal by allowance, we consider, *inter alia*, the scope of the authority of

the Department of Environmental Protection ("DEP") to issue administrative orders

under the Bituminous Coal Mine Safety Act.[1]  For the reasons that follow, we find that the DEP acted within its authority with respect to the orders it issued regarding certain failures to report accidents, but that it improperly issued other orders with respect to requiring fire extinguishers on certain mining vehicles.  Thus, we reverse in part, and affirm in part, the order of the Commonwealth Court.

Before we consider the specifics of this appeal, a brief overview of the law concerning mine safety in our Commonwealth is in order.  Historically, and not surprisingly, the mining of underground coal in Pennsylvania has been widely considered a dangerous endeavor.  While significant improvements in mining safety have been achieved over the years, the recent events at the 2002 Quecreek Mine accident in Somerset County Pennsylvania, where nine miners were trapped for three days in a flooded mine shaft, made manifest the continued perilousness of mining. While the federal government regulates mining in Pennsylvania through the Mine Safety and Health Administration Act, as amended by the Mine Improvement Emergency Response Act,[2] state governments are permitted to regulate mining as well, and our Commonwealth has done so for over 100 years.

Specifically, the progenitor of Pennsylvania's Bituminous Coal Mine Safety Act, entitled the Bituminous Coal Mine Act, was originally codified in 1883.  The most recent version of the statute was drafted in 1961 and constituted the first comprehensive mining legislation designed to regulate mining safety practices.  The 1961 version of the Act included various provisions concerning safety, including inspectors being tasked

---

[1] Act of July 7, 2008, P.L. 654, No. 55, 52 P.S. §§ 690-101 to 690-708.
[2] 30 U.S.C. § 801-878.

with inspecting mines on a regular basis, with the ultimate purpose being to protect the health and safety of miners.

In 2008, after years of work among industry, workers, and government representatives, the retitled "Bituminous Coal Mine Safety Act of 2008" ("Mine Safety Act" or "Act"), at issue herein, was unanimously enacted by the General Assembly. Stressing the theme of the statute, the legislature's findings declared that the "first priority and concern of all in the bituminous coal mining industry must be the health and safety of those who work in and at mines and others in and about mines."  52 P.S. § 690-103(a)(1).  Consistent therewith, the General Assembly added to the multiple declared purposes of the Act, including "[t]o use the full extent of the Commonwealth's powers to protect the lives, health and safety of miners and others in and about underground bituminous coal mines."  Id. § 690-103(b)(1).

Three aspects of the recent legislation are particularly noteworthy for purposes of the matter before us.  First, pursuant to Section 109 of the Mine Safety Act, mine operators must notify the DEP of "accidents" that occur at their mines, within 15 minutes of the discovery of the accident.  52 P.S. § 690-109(a)(1).  Unlike its predecessor, the Act provides a broad definition to the operative term "accident" as follows:

> **"Accident."**  An unanticipated event, including any of the following:
>
> (1)   A death of an individual at a mine.
>
> (2)   An injury to an individual at a mine, which has a reasonable potential to cause death.
>
> (3)   An entrapment of an individual at a mine which has a reasonable potential to cause death or serious injury.
>
> (4)   An unplanned inundation of a mine by a liquid or a gas.
>
> (5)   An unplanned ignition or explosion of gas or dust.

(6) An unplanned mine fire not extinguished within ten minutes of discovery.

(7) An unplanned ignition or explosion of a blasting agent or an explosive.

(8) An unplanned roof fall at or above the anchorage zone in active workings where roof bolts are in use.

(9) An unplanned roof or rib fall in active workings that impairs ventilation or impedes passage.

(10) A coal or rock outburst that causes withdrawal of miners or which disrupts regular mining activity for more than one hour.

(11) An unstable condition at an impoundment or refuse pile which does any of the following:

(i) Requires emergency action in order to prevent failure.

(ii) Causes individuals to evacuate an area.

(12) Failure of an impoundment or refuse pile.

(13) Damage to hoisting equipment in a shaft or slope which endangers an individual or which interferes with use of the equipment for more than 30 minutes.

(14) An event at a mine which causes death or bodily injury to an individual not at the mine at the time the event occurs.

52 P.S. § 690-104.

Second, the Mine Safety Act requires certain vehicles to carry portable fire extinguishers. Specifically, "[e]ach track or off-track locomotive, self-propelled mantrip car or personnel carrier shall be equipped with one portable fire extinguisher." 52 P.S. § 690-273(f).

Third, the Act created the Board of Coal Mine Safety ("Safety Board" or "Board"), which was established to provide the means to rapidly respond to changes in mining technology and conditions. 52 P.S. § 690-106. The Board, comprised of seven members representing the DEP, workers, and owner/operators, is given the authority to

write amendments to interim mandatory safety standards, as well as promulgate new mine safety regulations.

With this history and relevant legal background in hand, we turn to the facts underlying this appeal, which are largely undisputed and involve alleged violations of the Mine Safety Act at mines in the southwestern part of the Commonwealth. The instant case arises out of several orders issued by the DEP to Appellees as a result of Appellees' alleged failure to report various incidents that purportedly compromised the safety of their mines — i.e., the alleged failure to report an "accident" — as well as Appellees' alleged failure to maintain proper fire protection equipment. We first consider the charges of a failure to report an "accident."

Appellee Emerald Coal Resources L.P. ("Emerald") engages in underground bituminous coal mining at its Emerald Mine in Wayne Township, Greene County, Pennsylvania. On January 19, 2009, at approximately 10:00 p.m., a crew of miners working in the B-7 section of the operation mined through into the adjoining B-6 section. A plan for the cut through had been prepared and a mine examiner was to be sent and stationed at the B-6 section to wait for and listen for the approach of the mining crew in the B-7 section. The plan also required the mine examiner to close two doors that the company had erected for the purpose of maintaining safe ventilation in the mine following the cut through. Although the mine examiner went to the B-6 area, he did not remain there, and the doors stood open at the time of the cut through. Due to the doors remaining open, the ventilation in the area was affected. Specifically, a witness to the cut through felt the air along a conveyer belt reverse, and he could feel the heat from the feeder on his face. Additionally, a methane detector on a shuttle car sounded an

alarm. Once certain protective measures were taken at the cut through, employees entered the B-6 area and closed the doors, resulting in the ventilation returning to its proper path.

Emerald did not notify the DEP of the incident. Thus, on January 30, 2009, the DEP issued an administrative order for Emerald's violation of Section 109 of the Mine Safety Act for failing to report this "accident," even though Section 104 does not list a ventilation disruption as a specific reportable accident.

Appellee Cumberland Coal Resources L.P. ("Cumberland") is the owner and operator of Cumberland Mine in Waynesburg, Greene County, Pennsylvania. At approximately 2:00 a.m. on February 12, 2009, an electrical storm resulted in a power outage at its mine that caused a fan in the mine's ventilation system to stop working. The mine's backup power system also failed to start after the loss of power, and, as a result, the mine's ventilation system at the No. 5 bleeder shaft was inoperable for over 16 minutes. The diesel powered back-up system, which should have automatically been triggered, failed to operate. Ultimately, a fan monitoring system alerted surface personnel of the stoppage, and an electrician restarted the fan. The Mine Safety Act requires mine operators to evacuate the mine when a ventilation system is down for 15 minutes or more; however, such an event is not included in Section 104's list of "accidents" subject to reporting requirements. Cumberland did not notify the DEP of the fan outage, and the DEP issued an administrative order for the violation.

Turning to the alleged fire equipment maintenance violations, as noted above, the Mine Safety Act requires certain vehicles to contain portable fire extinguishers. The DEP, interpreting "off-track locomotive" to include "scoops," issued multiple

administrative orders and notices of violation to both Cumberland and Appellee Amfire Mining Co. ("Amfire") for failing to equip their scoops with portable fire extinguishers in violation of Section 273(f) of the Mine Safety Act. A scoop is a "battery-powered, four-wheeled vehicle equipped with a bucket" used "to transport tools, materials, and coal" throughout the mine. EHB Opinion, 3/16/10, at 2. Scoops have only one seat for the operator's use, and do not transport other miners. Id.

Emerald and Cumberland appealed their administrative orders to the Environmental Hearing Board ("EHB"), arguing they were not required to report the incidents that occurred at their mines because the incidents were not "accidents" as contemplated by Section 104 of the Mine Safety Act. The EHB consolidated these two cases, and the DEP moved for summary judgment, arguing the events occurring at both mines did, in fact, constitute "accidents" under Section 104 that required reporting under Section 109(a)(1).

Cumberland and Amfire also filed appeals to the EHB from the administrative orders issued regarding their failure to provide fire extinguishers on scoops, which were consolidated for review. The DEP and Cumberland/Amfire filed cross motions for summary judgment concerning whether a scoop constitutes a "locomotive" under Section 273(f) and whether the DEP had the authority under the Mine Safety Act to issue orders requiring Cumberland and Amfire to supply fire extinguishers for scoops.

The EHB denied the DEP's motions in both appeals. In the Emerald/Cumberland matter, the EHB found the DEP lacked the authority to issue orders effectively expanding Section 104's list of "accidents" to include the incidents that occurred at the Emerald and Cumberland mines. As to the Cumberland/Amfire matter, the EHB

determined a scoop was not a "locomotive" within the meaning of Section 273(f), and, thus, that the DEP erred in citing Cumberland and Amfire for violating the Mine Safety Act. The DEP appealed both decisions to the Commonwealth Court.

The Commonwealth Court consolidated the appeals and affirmed. DEP v. Cumberland Coal Resources, 29 A.3d 414 (Pa. Cmwlth. 2011). First, the court held Emerald and Cumberland did not violate the reporting requirements of Section 109(a)(1). In reaching this conclusion, the court looked to the definition of "accident" in Section 104 and noted the definition was subject to two different interpretations: the use of the word "including" before the list of events could signify that the list was not intended to be exclusive, and the use of the word "any" in the phrase "any of the following" could mean that the General Assembly intended the list to be exclusive. As such, the court determined Section 104 was ambiguous, and it deferred to the DEP's reasonable interpretation of the definition of "accident" as allowing additional events of the same general kind or class as those expressly set forth in the list. The court concluded, however, that the DEP could not expand this list through the adjudicatory process, as the General Assembly vested the Safety Board with the authority to develop the Mine Safety Act through rulemaking, and gave the DEP no such power. Accordingly, the court opined that the DEP's powers under the Mine Safety Act are limited to enforcing the express provisions of the Act and any regulations promulgated by the Safety Board. According to the court, were it to hold otherwise, the DEP could expand the list of "accidents" on a case by case basis without giving mine operators any advanced notice, effectively punishing operators for failing to act when they had no reason to know action was required.

The court also rejected the DEP's alternative argument that it had authority to issue the administrative orders pursuant to its general enforcement powers under Sections 105 and 501 of the Mine Safety Act. The court observed that Sections 105 and 501 contain no language giving the DEP authority to create rules and requirements under the Act, and it further opined that the General Assembly would not have expressly provided for an expedited reporting requirement for "accidents" in Section 109(a)(1) if it also allowed the DEP to use its general enforcement powers under Sections 105 and 501 to impose a similar reporting requirement for events not included in the definition of "accident."

As to the issue of whether the DEP established that Cumberland and Amfire violated Section 273(f) by failing to provide fire extinguishers for their scoops, the court held the DEP's interpretation of the term "locomotive" to include scoops was erroneous. In so holding, the court noted the General Assembly did not define the term "locomotive" in the Act, and it relied on both the technical and common dictionary definitions of "locomotive," which both define "locomotive" as a "powered vehicle used to move nonpowered vehicles." As scoops do not move nonpowered vehicles, the court agreed with the EHB that they were not locomotives and, thus, not subject to the requirements of Section 273(f). Additionally, for the same reasons the court held the DEP could not rely on its enforcement powers to expand the list of "accidents" under the Act, the court found the DEP also could not rely on its general enforcement powers under Sections 105 and 501 to require fire extinguishers to be placed on scoops.

Notably, Judge Pellegrini filed a vigorous dissent joined by Judges Leadbetter and McCullough. Therein, Judge Pellegrini focused solely on the issue of the reporting

requirements of Section 109, and disagreed with the majority's conclusion that the DEP was precluded from expanding the list of "accidents" in Section 104, as the Mine Safety Act contained no language indicating that enforcement of the Act depended on the Safety Board's enactment of regulations. According to Judge Pellegrini, to hold otherwise would allow the Safety Board to become a quasi-enforcement body, hindering the enforcement of the Mine Safety Act and the safety of miners.

We granted allocatur in the consolidated appeals, in sum, to address the scope of DEP's authority to interpret the Mine Safety Act beyond its express provisions with respect to the reporting of accidents and its authority to require portable fire extinguishers on certain mining vehicles. As the issues on appeal are pure legal questions, our standard of review is *de novo*, and our scope of review is plenary. Buffalo Twp. v. Jones, 813 A.2d 659, 664 n.4 (Pa. 2002). Moreover, as the issues overlap regarding the breadth of the DEP's authority, we will consider the issues stated above collectively.

The DEP first asserts that it acted under its authority as recognized by our Court's prior precedent when issuing its administrative orders in enforcing the Mine Safety Act. Indeed, the DEP contends that this Court has consistently recognized that administrative agencies possess both rulemaking *and* adjudicatory powers, citing Dept. of Env. Res. v. Butler County Mushroom Farm, 454 A.2d 1 (Pa. 1982) and Pa. Human Rel. Comm. v. Norristown Area Sch. Dist., 374 A.2d 671 (Pa. 1977).

The DEP develops that the situation *sub judice* is analogous to that in Butler County, wherein its predecessor, the Department of Environmental Resources ("DER"),[3] acting under the General Safety Law,[4] issued an administrative order to the Butler County Mushroom Farm after identifying a potential fire safety issue. Specifically, the DEP offers that, in Butler County, during an inspection of the Mushroom Farm, the DER noted a problem in tracking every person who was underground in the limestone mines in which the mushrooms were grown. The DER observed that, while the Mushroom Farm identified every hourly employee underground, it did not have a process to identify supervisors, independent contractors, repairmen, or visitors, including high school students on tours. This was critical to the DER, as, in the event of a fire, the absence of individuals in the mines would allow rescuers to avoid embarking upon an unnecessary and dangerous search and rescue mission. In response, the DER ordered the Mushroom Farm to develop and implement a system to track all individuals in the mines. The Mushroom Farm appealed the order to the EHB, contending the DER did not have legal authority to issue such an order. While the EHB affirmed the issuance of the order, on appeal, the Commonwealth Court reversed.

DEP points to our Court's resolution of the issue in favor of the DER, noting that the adjudicatory power was a customary and vital tool in the operation of administrative agencies, that unforeseeable circumstances required flexibility, and that the choice of

---

[3] The General Assembly changed the agency's name from the DER to the DEP, created a new agency, the Department of Conservation and Natural Resources ("DCNR"), and assigned to the new agency some of the responsibilities which previously had been assigned to the DER. Management of the Commonwealth's state parks and forests were the primary functions vested in the new DCNR. 71 P.S. § 340.101, *et seq*.

[4] Act of May 18, 1937, P.L. 654, as amended, 43 P.S. §§ 25-1 *et seq*.

proceeding by general rule or by individual *ad hoc* litigation was for the discretion of the administrative agency. Butler County, 434 A.2d at 4 n.2. Although the text of the General Safety Law spoke only of "instructions," the DEP stresses that our Court nevertheless concluded that the statute authorized the issuance of the administrative orders. Indeed, the DEP notes that our Court went further and held that the DER's ability to issue such orders extended beyond the borders of the statute itself. Id. at 8.

The DEP further points out that this Court in Butler County relied upon our prior decision in Norristown Area, wherein we affirmed, in the context of ending school segregation, that the Human Relations Commission could act by rule-making or on a case-by-case basis through litigation. The DEP emphasizes that our Court held that there was no abuse of discretion on the part of the Commission by choosing to proceed to remedy segregation through adjudication proceedings.

The DEP maintains that it relied upon this precedent to issue the administrative orders in the matters before us, and that both mandating reporting to the DEP about life endangering mining incidents, and requiring fire extinguishers on scoops, were consistent with and furthered the purposes of the Mine Safety Act. Indeed, the DEP submits that it was merely interpreting a statute that it is responsible for implementing, and, with respect to reporting, a statute that contains a non-exhaustive list of already existing statutory requirements.

The DEP further challenges what it regards as the Commonwealth Court's overly restrictive construction of the Mine Safety Act, arguing that it is both contrary to the plain language of the statute and the General Assembly's intent to modernize the Commonwealth's mine safety laws. Specifically, the DEP cites Section 105, which

grants to the DEP the "power and the duty to administer a mine safety program for individuals employed at mines," including the power to "[i]ssue orders to implement and enforce the provisions of this act." 52 P.S. § 690-105(1), (3). The DEP contends this is one of the many enumerated powers and duties conferred on the DEP as part of its overall power and duty to administer the mine safety program. Even more broadly, the DEP points to its power to issue written orders "to enforce this act, to effectuate the purposes of this act and to protect the health and safety of miners and individuals in and about mines." 52 P.S. § 690-501(a). Thus, according to the DEP, the express and expansive authority conferred by the Mine Safety Act upon the DEP allows it to issue administrative orders requiring actions not specifically expressed by statute that promote safety.

Building on this argument, the DEP maintains that the General Assembly substantially re-wrote the prior existing law, created the Safety Board to promulgate regulations, and empowered the DEP to issue orders to protect miner safety. The DEP submits that the Act contains nothing that would suggest the Safety Board's authority to promulgate regulations dilutes the DEP's adjudicatory authority under the Act, and contends that both provisions should be given full force and effect to protect the "lives, health and safety of miners and others in and about underground bituminous coal mines." 52 P.S. § 690-103(1).

The DEP further avers that it is its interpretation of the Mine Safety Act, permitting it to issue administrative orders for incidents not expressly provided for in the Act, that is entitled to deference. According to the DEP, the Safety Board is the "administrative legislative branch" which enacts regulations, but it is the DEP which

possesses specialized knowledge of, and the greatest practical experience with, mine safety issues. The DEP asserts it interpreted and applied the Mine Safety Act to the incidents at issue, in light of the expansive definition of the statutory term "accident" and the requirement to provide notice to the DEP. In concluding that the mine operators should have provided notice of the incidents at issue, the DEP reasons that it was merely exercising its prerogative to interpret the statute as it deemed appropriate, as long as that interpretation is consistent with the Mine Safety Act. Similarly, DEP asserts that it reasonably determined that scoops fell within the term "off-track locomotive" under the Mine Safety Act and ordered operators to equip such vehicles with fire extinguishers.

The DEP also offers various tenets of statutory construction in support of its position. Specifically, the DEP points out that the General Assembly is presumed to intend that all provisions in a statute are to be given effect, citing 1 Pa.C.S.A. §§ 1921(a), 1922(2). Here, it notes Section 106 of the Act empowers the Safety Board to promulgate appropriate regulations to protect the health and safety of miners and others, and consistent therewith, Section 501 of the Act empowers the DEP to issue written orders.

In response, Appellees' primary contention is that the Commonwealth Court properly determined that the DEP was without authority under Section 501 and 105 of the Mine Safety Act to issue administrative orders that had the effect of creating new events constituting "accidents" under Section 104. Stated another way, Appellees maintain that the definition of "accidents" in Section 104 of the Mine Safety Act is exhaustive and the DEP cannot expand the listing of events contained therein.

Appellees offer that the General Assembly bifurcated the compliance and rulemaking functions under the Mine Safety Act, as Section 106.1 explicitly vested the Safety Board with broad rulemaking authority, and reserved implementation and enforcement powers to the DEP under Sections 105 and 501. According to Appellees, if the DEP were able to, in essence, engage in rulemaking as well as issue administrative orders, it would undermine the legislature's intent to grant sole rulemaking power to the Safety Board, and would make the Safety Board's rulemaking powers superfluous and redundant.

Appellees contend that not only does the DEP lack authority to issue administrative orders expanding the requirements of the Act, but that the DEP offers no effort to define or limit the scope of this "catch-all" authority. This, Appellees stress, is markedly unfair, given the criminal and civil penalties that accompany a violation of the Mine Safety Act and results in an *ad hoc* process in which the mine operator would have no notice of the statute's requirements and anticipating its reporting requirements. Appellees urge that this is especially true where the rule requires reporting an event within 15 minutes of an accident. Indeed, Appellees submit that a general authority given to DEP based upon an obligation to protect "health and safety" of miners, without any specific meaning, would prevent a mine operator from being proactive in complying with the Act.

Appellees also offer our decision in Pa. State Bd. of Pharm. v. Cohen, 292 A.2d 277 (Pa. 1972), in which our Court considered a pharmacist's appeal of the suspension of his license by the Board of Pharmacy for "grossly unprofessional conduct" under the Pharmacy Act. While not violating any of the specifically enumerated grounds that

constituted "grossly unprofessional conduct," the Board of Pharmacy nevertheless took the position that such prohibitions were not intended to be exclusive, but only an exemplary description of the prohibited conduct which served as guidance to the Board. Appellees point out that our Court rejected such a claim of expansive powers, instead limiting the meaning of "gross unprofessional conduct" to those listed in the statute. Cohen, 292 A.2d at 280-81. Appellees argue that the DEP should defer to the Board's rulemaking powers to clarify which events constituted "accidents," and what equipment must be provided with fire extinguishers. Further, Appellees distinguish Butler County and Norristown Area as being factually unique and arising in the context of statutes that did not delegate rulemaking authority to a board. According to Appellees, the DEP is improperly trying to prescribe general rules of conduct via adjudication, yet, the line of demarcation between rulemaking and enforcement under the Mine Safety Act prohibits the DEP's approach.

Further, Appellees maintain that, in the event that this Court finds that Section 104 is not exclusive, and the General Assembly intended to grant unlimited power to the DEP, such a grant of "catch-all" power would be unconstitutional, as an impermissible delegation of legislative power in violation of Pa. Const. art. 2, § 1. According to Appellees, the DEP in this instance is acting as a super-legislature and in a fashion contrary to what the legislature intended when creating the Board. Appellees urge that this is true for the DEP's expansion of what constitutes an "accident," as well as its decision to require fire extinguishers on scoops. Similarly, Appellees make a constitutional argument that any application of "catch-all" authority is unconstitutionally

vague, as the requirements would be uncertain and ambiguous, rendering compliance impossible.

Appellees also present a statutory construction analysis. They offer that the Mine Safety Act, because it imposes criminal and civil penalties for non-compliance, must be strictly construed against the Commonwealth; accordingly, they contend the immediate reporting requirements must be limited to the events enumerated in Section 104. Appellees again emphasize that, if DEP had the power to expand reporting requirements, mine operators would be left in a state of uncertainty as to when to provide the DEP notice. Addressing the expansive phrase "including any of the following" with respect to enumerated events that constitute accidents, Appellees turn to Black's Law Dictionary and assert that the term "including" may expand a meaning, but also may merely specify a particular thing already included within general words already used. Pointing to the prior mine safety statute, Appellees vaguely offer that a policy issued pursuant to that statute listed 14 events requiring notification, and, although not identical to those contained in the present statute, the policy spoke to two events not included in the statute, one relating to ventilation interruptions and one regarding unplanned connections into abandoned workings. These two events, as noted by Appellees, were not included in the 2008 version of the Mine Safety Act and, according to Appellees, this omission indicates that the legislature did not intend the statute to include these circumstances as reportable accidents.

Appellees also offer that the General Assembly adopted the federal regulatory list of accident notifications, limited to the 14 enumerated events as prescribed by federal law. Appellees claim, because the state statute was patterned after the federal law, the

two should be construed together. Construing the two statutes together, Appellees point out that the only difference between the statutes is the prefatory language that an accident was an "unanticipated event, including any of the following." According to Appellees, as noted above, this additional text does not change the meaning of the statute, and that it is merely consistent with limiting the definition to events prescribed by federal law.

Finally, with respect to the requirement of fire extinguishers on scoops, Appellees point out that, under Section 273(f) of the Mine Safety Act, operators are required to equip locomotives, self-propelled mantrip cars, and personnel carriers with one portable fire extinguisher. Appellees offer that scoops, like numerous other self-propelled vehicles used in mining that are equipped with fire suppression systems, are excluded from this requirement; however, the DEP contends that they are "off-track locomotives" and, thus, required to carry fire extinguishers. According to Appellees, scoops are not locomotives, as they are not merely engines used for pulling, but are equipped with a bucket for scooping material off the mine floor. Further, Appellees note that personnel carriers and mantrips are used to move individuals in and out of the mines, but a scoop has a single operator with no seats for passengers. Thus, Appellees argue that Section 273(f) simply does not support the DEP's position that a scoop must carry a fire extinguisher, and any attempts to require such equipment on that vehicle requires rulemaking. Finally, Appellees contend that the DEP is entitled to no deference in its interpretation of the Mine Safety Act, as the language is clear that scoops are not the type of vehicle required to carry portable fire extinguishers. That being the case,

Appellees assert that the unambiguous expressed intent of the legislature must be given effect.

With the arguments of the parties in hand, we turn to the jurisprudential principles underlying our review. Specifically, the primary focus of the parties is on the terms of the Mine Safety Act. Thus, we necessarily turn to the Statutory Construction Act. 1 Pa.C.S.A. §§ 1501 *et seq.* Pursuant to that Act, the objective of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Id. § 1921(a). The best indication of the legislature's intent is the plain language of the statute. When considering statutory language, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage." Id. § 1903(a). Further, when the words of a statute are clear and unambiguous, there is no need to go beyond the plain meaning of the language of the statute "under the pretext of pursuing its spirit." Id. § 1921(b). Thus, only when the words of a statute are ambiguous should a reviewing court seek to ascertain the intent of the General Assembly through considerations of the various factors found in Section 1921(c). Id. § 1921(c); see generally Bayada Nurses Inc. v. Com. Dept. Labor and Indus., 8 A.3d 866, 880-81 (Pa. 2010). Finally, an administrative agency's interpretation of a governing statute is to be given controlling weight, unless that interpretation is clearly erroneous. Whitaker Borough v. PLRB, 729 A.2d 1109, 1110 (Pa. 1999).

We first consider the issue of whether the DEP acted within its authority with respect to the administrative orders issued regarding the mine operators' failure to report certain accidents.

As noted above, the DEP asserts that it has broad authority to protect miner health and safety. The Mine Safety Act empowers it to "administer a mine safety program for individuals employed at mines" and to "[i]ssue orders to implement and enforce the provisions of this act." 52 P.S. § 690-105(a), (a)(3). Traditionally, administrative agencies enjoy wide latitude in implementing, interpreting, and enforcing their statutory mandate. Moreover, pursuant to the Mine Safety Act, the DEP is expressly charged with certain safety-related responsibilities and enjoys broad powers in fulfilling its mission in this regard.

Yet, we need not speak to the breadth of, or limitations on, this general authority to determine this matter. The parties do not dispute that administrative agencies have authority to interpret their guiding statute and that they may enforce that enactment's provisions. Thus, we are able to resolve the issue of whether the DEP properly issued its orders regarding a failure to report certain accidents on the more narrow grounds of whether the DEP properly interpreted the relevant statutory reporting language contained in the Act.

To determine the General Assembly's intent in this regard, we first look to the express statutory language in question. Pursuant to Section 109 of the Mine Safety Act, mine operators must notify the DEP of "accidents" that occur at their mines, within 15 minutes of the discovery of the accident. 52 P.S. § 690-109(a)(1). Turning to the definition of "accident," Section 104 describes an accident as an "unanticipated event, including any of the following . . . ." 52 P.S. § 690-104. Fourteen types of unanticipated events follow this introductory phrase, as set forth above.

The focus of the precise controversy here centers upon the meaning of the phrases "unanticipated event" and "including any of the following." In sum, the DEP claims this language to be expansive, and includes not only the specifically expressed unintended events, but other unanticipated incidents outside of the list as well, while Appellees assert that the 14 unanticipated events are exhaustive — i.e., that they are the only events which can constitute an "accident" for purposes of the DEP's enforcement.

Initially, we note the definition of "accident" begins with the generic reference to an "unanticipated event." If the General Assembly had intended to limit reportable "accidents" to the 14 listed events, there would have been no need for the definition to first state that an "accident" is an "unanticipated event." Indeed, all of the prefatory language to the 14 examples would be surplusage under the Appellees' interpretation of Section 104. Conversely, by employing the phrase "unanticipated event," the legislature rendered the understanding of "accident" to be broad in scope and meaning.

Turning to the next phrase, it is widely accepted that general expressions such as "including," or "including but not limited to," that precede a specific list of included items are to be considered as words of enlargement and not limitation. Pa. Human Rel. Comm. v. Alto-Rest Park Cemetery Ass'n., 306 A.2d 881, 885 (Pa. 1973). Indeed, such a list of specific items is not meant to be exclusive of all items other than those specifically named. Id. Yet, these terms also should not be construed in their widest context. Under our venerable statutory construction doctrine of *ejusdem generis* ("of the same kind or class"), where specific terms setting forth enumeration of particular classes of persons or things follow general terms, the general words will be construed

as applicable only to persons or things of the same general nature or class as those enumerated. See Steele v. Statesman Ins. Co., 607 A.2d 742, 743 (Pa. 1992); Summit House Condominium v. Commonwealth, 523 A.2d 333, 336 (Pa. 1987); Breininger v. Sheet Metal Workers Int'l. Ass'n. Loc. Union No. 6, 493 U.S. 67, 91-92 (1989). In sum, the presence of such a term as "including" in a definition exhibits a legislative intent that the list that follows is not an exhaustive list of items that fall within the definition; yet, any additional matters purportedly falling within the definition, but that are not express, must be similar to those listed by the legislature and of the same general class or nature. Further, contrary to Appellants' assertions, we find that the term "any," as used in the phrase "including any of the following" does not place a limitation on the definition, but, rather, sharpens the point that the list of 14 events is not exhaustive, but merely included as the type of events that may constitute an accident.

With these preliminary interpretations in mind, we turn to consideration of the 14 matters set forth in Section 104. These occurrences include unanticipated events such as death, serious injury, entrapment of an individual with reasonable potential for serious injury, inundation of a mine by liquid or gas, unplanned ignition or explosion of gas or dust, unplanned roof fall that impairs ventilation, an unstable condition requiring emergency action, and damage to hoisting equipment which endangers an individual or interferes with the use of equipment for more than 30 minutes. As is clear from this list, the unanticipated events contained in Section 104 all share the common thread of fairly serious unplanned incidents that potentially pose a serious risk to miners and other individuals' health, safety, or life. Thus, as the DEP has the power to interpret and enforce the Mine Safety Act, the DEP has the authority to issue administrative orders for

a failure to report unanticipated events if they may be regarded as of the same general class or nature as those expressly set forth in Section 104 — i.e., those involving fairly serious incidents potentially impacting the miner or other individual's health, safety, or life.

Thus, the question then becomes whether the unplanned changes in ventilation flow and a power failure resulting in an inoperable ventilation system are substantially similar and of the same general class as the expressly listed examples of an unplanned event constituting an "accident." We believe these unanticipated circumstances occurring at the Emerald and Cumberland Mines fit comfortably in this class of events. As noted by the EHB, Emerald did not dispute the DEP's contention that the incident at its mine caused a potential threat to the health and safety of the miners. EHB Opinion, 2/24/2010 at 2. Indeed, at the Emerald Mine, the change in ventilation was accompanied by a methane detector being activated. Moreover, with respect to the Cumberland Mine, the EHB explained "there is no dispute that the loss of ventilation caused by the malfunctioning equipment posed a potential threat to the health and safety of miners, not only directly as a result of the disruption in air flow, but indirectly as a result of the need to commence an evacuation of numerous miners over long distances on foot." Id. at 3.

Because the accidents alleged by the DEP involving changes in, and cessation of, air flow to miners were of the same general class and similar to the unanticipated events incidents listed in Section 104, we have no hesitation concluding that, based upon the plain language of Section 104, the DEP was within its authority to issue the administrative orders regarding Appellees' failure to report these unanticipated events.

Moreover, our conclusion is made in the light of an administrative agency's interpretation of a governing statute enjoying controlling weight, as noted above, unless clearly erroneous.

Appellees' protestations to the contrary are without merit. Specifically, Appellees' position is that, by interpreting Section 104 to include events beyond those expressly listed, the DEP engaged in rulemaking, and, if permitted, would make the Safety Board's rulemaking powers superfluous. Appellees' argument is overstated. Our conclusion that the DEP properly has the authority to interpret and enforce the Mine Safety Act with respect to the reporting of accidents refutes Appellees' contention that it engaged in unlawful rulemaking in contravention to the rulemaking functions of the Safety Board. The DEP's interpretation of its governing statute and enforcement of a broad statutory directive is not rulemaking. Moreover, while Section 106.1 of the Act vests the Safety Board with rulemaking powers, permitting the DEP to engage in traditional interpretation and enforcement responsibilities, based upon statutory authority, would not render the Safety Board's rulemaking powers superfluous or redundant, as the Board could, consistent with its statutory powers, promulgate new rules or amend existing ones. Nor does it avoid or undermine the legislature's construct for rulemaking through the Safety Board. Indeed, every statute should be construed, if possible, to give effect to all of its provisions, 1 Pa.C.S.A. § 1921(a), and the legislature intends for the entire statute to be effective and certain, id. § 1922(2). Here, there is no indication that the General Assembly intended that enforcement of the Mine Safety Act was solely dependent upon the Safety Board's promulgation of regulations, and there is

no evidence of a concomitant legislative intent to strip the DEP of its traditional interpretive and enforcement powers. See Butler County; Norristown Area.

Our determination that both the DEP and the Safety Board are authorized to act to protect the health and safety of miners — through interpretation and enforcement, and by rulemaking, respectively — is consistent with these principles. The protection of miners under the Act may be through enforcement of reasonably interpreted statutory requirements and through the formal promulgation of regulations, and both methods support the overarching and laudable purposes of the Mine Safety Act. Moreover, the authority conferred upon each of these entities does not mean a diminution in the powers of the other. Thus, we reject Appellees' assertion that the DEP's actions are, in essence, preempted by the regulation promulgation powers of the Safety Board.

Further, Appellees contend federal mine safety regulation, through the federal Mine Safety and Health Act, as amended by the Mine Improvement and New Emergency Response Act, is limited to the enumerated events and that our statute was based upon that law. Thus, we compare the federal mine safety statute with our Commonwealth's Mine Safety Act.

The federal definition is limited, and offers that "accident means" one of 12 listed items. 30 CFR § 50.2(h). By its express terms, Pennsylvania's Mine Safety Act's definition is clearly broader, including in the definition that the matter be an "unanticipated event," and, more importantly, using the above-stated broadening verbiage, "including any of the following." While Appellees claim that the Mine Safety Act is based upon the federal statute, and should be limited to the enumerated items

contained therein, the express words of the Mine Safety Act command a different conclusion.[5]

Also, as noted above, Appellees offer somewhat cursory arguments that embracing the DEP's interpretation of Section 104 would constitute an unconstitutional delegation of legislative power and would render the statute unconstitutionally vague. We disagree.

The legislature may not constitutionally delegate its power to make, alter, and repeal laws to other branches of government or to any other body or authority. It may, however, delegate authority and discretion in connection with the execution and administration of its law, and it may establish primary guidelines and bestow upon others the duty to carry out declared legislative policy in accordance with the general provisions of the enabling legislation. The touchstone of such delegation is that it is for the General Assembly to make basic policy choices. <u>Pennsylvanians Against Gambling Expansion Fund v. Commonwealth</u>, 877 A.2d 383, 417 (Pa. 2005). In determining whether the legislature has established adequate standards, a court must consider the language of the statute, the underlying purpose of the statute, and its reasonable effect. <u>Blackwell v. State Ethics Comm'n.</u>, 567 A.2d 630, 636-37 (Pa. 1989).

---

[5] Appellees' reliance upon our decision in <u>Cohen</u>, <u>supra</u>, fails for the same reason. In that matter, a pharmacist's license was suspended for "grossly unprofessional conduct." 63 P.S. § 390-5(a)(9). Under the Pharmacy Act, "grossly unprofessional conduct" consisted of 13 specific prohibitions. The statutory provision, unlike the section at issue in this appeal, was limited to certain specifically enumerated grounds, and did not include any broadening language. Our Court reasoned that the legislature specifically intended to define "grossly unprofessional conduct" by the 13 enumerated grounds, and, thus, the State Board of Pharmacy could not expand that definition in the absence of statute or rule. <u>Cohen</u>, 292 A.2d at 282-83.

We find that the statutory language employed by the General Assembly explains in sufficient detail the type of unanticipated events which constitute reportable accidents under the Mine Safety Act. It reflects not only basic policy choices, but a specifically articulated class of events which must be reported to the DEP. Further, this understanding of the definition of "accident" is entirely consistent with the underlying purpose of the Mine Safety Act, which could not be clearer: "[t]o use the full extent of the Commonwealth's powers to protect the lives, health and safety of miners and others in and about underground bituminous coal mines." 52 P.S. § 690-103(b)(1). Finally, the reasonable effect of the statute is to place mine operators on reasonable notice of the types of unanticipated events which constitute accidents, and which are reportable to the DEP. In sum, Section 104, and the DEP's interpretation thereof, does not impermissibly delegate to the DEP basic legislative policy choices regarding mine safety.

Further, we find that our interpretation today does not, as Appellees have argued, render the Mine Safety Act unconstitutionally vague. Under a void-for-vagueness challenge, a statute will be found unconstitutional only if the enactment is so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application. Commonwealth v. Cotto, 753 A.2d 217, 220 (Pa. 2000). A statute will pass a vagueness attack if the statute defines the objectionable conduct "with sufficient definiteness, that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Commonwealth v. Bullock, 913 A.2d 207, 212 (Pa. 2006). In essence, a statute must give fair warning as to the conduct it penalizes.

In defining the term "accident," the General Assembly has offered 14 examples of the types of unanticipated events that it intended to be covered by the Act and subject to its notice requirements. As noted above, all 14 examples are events which are fairly serious incidents potentially impacting the miner or other individual's health, safety, or life. Contrary to Appellees' assertion that mine operators will be left in a state of uncertainty, we find that these examples provide sufficient guidance and definiteness regarding the nature of unanticipated events that constitute reportable accidents such that ordinary individuals are able to understand what conduct is required to be reported, and in our view, such statutory definition does not encourage arbitrary and discriminatory enforcement. Commonwealth v. Davidson, 938 A.2d 198, 207 (Pa. 2007). Moreover, as offered by Judge Pellegrini in his dissenting opinion below, if a byproduct of this broader understanding of reportable accidents is the over-reporting of incidents in an abundance of caution, such effect will increase the safety of miners, an outcome consistent with the overall purpose of the Act. Cumberland Coal Resources, 29 A.3d at 436 (Pellegrini, J. dissenting).

For all of the foregoing reasons, we find that the DEP acted within its statutory authority when it issued the administrative orders regarding Appellees' failure to report the "accidents" at issue, as they were of the same general class or nature as those expressly set forth in Section 104 — i.e., those involving fairly serious incidents potentially impacting miner's or other individual's health, safety, or life. Thus, we reverse the order of the Commonwealth Court on this issue.

We next turn to the DEP's sanctioning of Appellees for a failure to comply with Section 273 of the Mine Safety Act which requires a portable fire extinguisher for certain

mining vehicles. Specifically, Section 273 requires that each "track or off-track locomotive, self-propelled mantrip car or personnel carrier shall be equipped with one portable fire extinguisher." 52 P.S. § 690-273(f). The DEP considered the scoops at issue in this appeal to be "off-track locomotives," requiring a portable fire extinguisher. Appellees, as noted above, refute this understanding and, instead, assert that a scoop, which has a shovel, is used to remove coal, and is driven by a single individual, is not a locomotive, as a locomotive pushes or pulls cars and a scoop does not. As a scoop is not a locomotive, Appellees assert that the DEP was without authority to require a portable fire extinguisher on such vehicles.

As with the prior issue on appeal, our initial focus in resolving this issue is on the language employed by the legislature in the statute, in this instance, to determine if the DEP erred in applying the portable fire extinguisher requirement to scoops. We note that Section 273 is specific, limited in scope, and lacks any broader "including" language found in Section 104. The provision lists three particular pieces of mining transportation vehicles which require a portable fire extinguisher. Focusing on the term "locomotive," dictionaries commonly provide that a locomotive is a "self-propelled engine, now usually electric or diesel-powered, that pulls or pushes freight or passenger cars on railroad tracks." American Heritage Dictionary of the English Language, Houghton Mifflin Morris 766 (ed. Boston 1996). Conversely, a "scoop" is a battery-powered, four wheel vehicle with a single operator seat that is equipped with a bucket and used in underground mines to transport tools, materials, and coal from one location to another in the mine; it does not pull or push anything. Scoops are used daily and travel throughout a mine. R.R. 98a. While, generally, scoops are equipped with fire suppression systems, the

scoop battery, which is large and can accumulate coal dust, is not protected by a fire suppression system. Id. We also note that the other vehicles listed — a mantrip car and personnel carriers — just as the terms connote, are vehicles used for shuttling and carrying miners, and scoops are neither used to transport miners nor pull cars of supplies or coal.

By its plain and narrow language, the statutory portable fire extinguisher requirement is limited to three statutorily enumerated types of vehicles, none of which specifically include, or could reasonably be understood to include, a scoop or scoop-like vehicle. A scoop does not pull or push freight or passenger cars. Nor does a scoop move individuals in and out of a mine, like a mantrip car or personnel carrier, as a scoop has a single operator seat with no room for passengers. Indeed, consistent with our discussion above regarding the definition of "accident," if a scoop were substantially similar to these vehicles, or in the same general class, the DEP's interpretation may have more validity; but to interpret the definition of "locomotive" to include a scoop would be to stretch the plain meaning of the term used by the General Assembly beyond the breaking point. Consistent with the limited statutory language delineating the specific types of vehicles encompassed by this statutory provision, we find that scoops fall outside of the requirements of Section 273. While an administrative agency's interpretation of a governing statute is to be given controlling weight, there are limitations, and here, based upon the plain language of the statute, the DEP's interpretation of Section 273 was clearly erroneous. Whitaker Borough, supra.

The DEP hinted as much in its argument before the Commonwealth Court, wherein it took the position that a scoop was a locomotive, but nevertheless suggested

that, even if not a locomotive, because mandating fire extinguishers is safety related, it was a permissible exercise of its authority. The DEP points to Section 501 of the Act which permits the DEP to "effectuate the purposes of this act and to protect the health and safety of miners and individuals in and about mines." 52 P.S. § 690-501. According to the DEP, this section, pertaining to enforcement powers and remedies, expands upon the already broad powers enjoyed by the DEP and allows it to issue orders to mine operators to perform actions not contemplated by statute or regulation for the purpose of promoting miner safety. We do not doubt that the DEP enjoys broad powers to carry out the laudable and essential purposes of the Mine Safety Act, and, more specifically, that requiring a portable fire extinguisher to be carried by scoops may be exceedingly prudent; however, the DEP's suggestion that, simply because it is safety related, it can require fire extinguishers on all vehicles, even if they are not statutorily required, would be to arrogate a power without a statutory basis, make it virtually impossible for a mine operator to reasonably understand what was required of it so as to comply with the law, and to raise the specter of constitutional infirmity on the basis of vagueness.

Thus, we find that the DEP acted outside of its statutory authority when it included a scoop in the limited vehicular category of locomotive, mantrip car, or personnel carrier, which require a portable fire extinguisher, and, therefore, we affirm the Commonwealth Court's order with respect to this issue.

For all of the above-stated reasons, we hold that (1) the DEP acted within its statutory authority when it issued the administrative orders to Appellees for their failure to report the "accidents" at issue in this appeal, under 52 P.S. § 690-104; but (2) the

DEP acted outside its authority when it required scoops to be equipped with a portable fire extinguisher under 52 P.S. § 690-273(f). Thus, we reverse in part, and affirm in part, the order of the Commonwealth Court.

Jurisdiction relinquished.

Mr. Chief Justice Castille and Messrs. Justice Eakin, Baer, McCaffery and Stevens join the opinion.

Mr. Justice Saylor files a concurring opinion.