**[J-55-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| THE MARCELLUS SHALE COALITION, | : | No. 69 MAP 2021 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 573 |
| | : | MD 2016 dated August 12, 2021. |
| v. | : | |
| | : | ARGUED:  September 15, 2022 |
| | : | |
| DEPARTMENT OF ENVIRONMENTAL | : | |
| PROTECTION OF THE COMMONWEALTH | : | |
| OF PENNSYLVANIA AND | : | |
| ENVIRONMENTAL QUALITY BOARD OF | : | |
| THE COMMONWEALTH OF | : | |
| PENNSYLVANIA, | : | |
| | : | |
| Appellants | : | |

*Justice Donohue delivers the Opinion of the Court with respect to Parts I-V, and VI(C)(2), and announces the Judgment of the Court.*

**OPINION**

**JUSTICE DONOHUE**                                    **DECIDED:  April 19, 2023**

In this appeal as of right, we are asked to pass upon the breadth of the legislative rulemaking authority given to the Department of Environmental Protection (the "Department") and the Environmental Quality Board (the "Board") (collectively, the "Agencies") by the General Assembly in the Pennsylvania Oil and Gas Act of 1984.[1]  The Agencies submit that the Commonwealth Court erroneously concluded that they exceeded their authority and consequently struck down certain regulations designed to aid the Agencies in information gathering attendant to the issuance of permits for new

---

[1]  Dec. 19 P.L. 1140, No. 223.

unconventional gas wells. For the following reasons, we find that the General Assembly intended to give the Agencies the leeway to promulgate the challenged regulations and that those regulations are reasonable. We therefore reverse the Commonwealth Court.

## I. Procedural History

The instant petition for review was one of many lawsuits concerning Act 13 of 2012, which amended Pennsylvania's Oil and Gas Act. "Act 13 comprises sweeping legislation affecting Pennsylvania's environment and, in particular, the exploitation and recovery of natural gas in a geological formation known as the Marcellus Shale." *Robinson Twp., Washington Cnty. v. Commonwealth*, 83 A.3d 901, 913 (2013) (OAJC). The oil and gas industry uses two primary methods to extract natural gas, both of which "inevitably do violence to the landscape." *Id*. at 914. In enacting Act 13, "the General Assembly has made a policy decision respecting encouragement and accommodation of rapid exploitation of the Marcellus Shale Formation[.]" *Id*. at 928.

Act 13 included the grant of authority by the General Assembly to the Agencies to promulgate regulations for unconventional gas wells. On December 14, 2013, the regulations were first published for public comment. Over 28,000 public comments were received and considered, with 429 individuals testifying across twelve public hearings. In 2016, the Board published regulations pertaining to applications for a permit to drill an unconventional gas well.

On October 13, 2016, the Marcellus Shale Coalition (the "MSC") filed a Petition for Review in the Nature of a Complaint Seeking Declaratory and Injunctive Relief (the "Petition"). The Petition raised seven counts, only one of which is at issue in this appeal.[2]

---

[2]  The MSC accompanied its petition with a request for expedited review and a stay. Then-Judge, now Justice, Brobson, sitting as the trial court, issued a single-judge opinion and order preliminarily enjoining some of the regulations. We addressed the Agencies' (continued…)

That count pertained to portions of the regulations set forth at Sections 78a.1 and 78a.15. Each challenged regulatory provision interacts to some degree with Section 3215 of the Oil and Gas Act of 2012,[3] titled "Well location restrictions." 58 Pa.C.S. § 3215. The following portion of that statute directs the Agencies to consider certain "public resources" when deciding whether to approve a well:

> **(c) Impact.**--On making a determination on a well permit, the department shall consider the impact of the proposed well on **public resources**, including, but not limited to:
>
>> (1) Publicly owned parks, forests, game lands and wildlife areas.
>>
>> (2) National or State scenic rivers.
>>
>> (3) National natural landmarks.
>>
>> (4) Habitats of rare and endangered flora and fauna and **other critical communities**.

---

appeal of that order in a decision issued on June 1, 2018. *See Marcellus Shale Coal. v. Dep't of Env't Prot. of Commonwealth*, 185 A.3d 985 (Pa. 2018).

Meanwhile, merits review proceeded in the Commonwealth Court. *Id.* at 994. On March 14, 2018, the MSC filed an application for partial summary relief on counts three, five, and six. Separately, on August 31, 2017, the MSC sought summary relief on count one. The Commonwealth Court addressed count one by opinion published August 23, 2018. *Marcellus Shale Coal. v. Dep't of Env't Prot.*, 193 A.3d 447, 455 (Pa. Commw. 2018). That is the opinion and order at issue here. Previously, the Agencies appealed that order, and we quashed without prejudice to raise the claims on appeal from a final order. *Marcellus Shale Coal. v. Dep't of Env't Prot.*, 198 A.3d 330 (Pa. 2018) (per curiam).

Thereafter, the parties filed cross applications for summary relief on counts two through seven. Now-Justice Brobson authored the opinion dealing with those applications, which left several counts pending. *Marcellus Shale Coal. v. Dep't of Env't Prot.*, 216 A.3d 448, 457 (Pa. Commw. 2019). The parties filed cross-appeals, and we quashed both appeals until a final order was entered. *Marcellus Shale Coal. v. Dep't of Env't Prot.*, 223 A.3d 655 (Pa. 2019) (per curiam). The parties then filed a joint Stipulation for Settlement and Joint Application for Relief disposing of counts two through seven, leaving only count one.

[3] 58 Pa.C.S. §§ 2301–3504.

(5) Historical and archaeological sites listed on the Federal or State list of historic places.

(6) Sources used for public drinking supplies in accordance with subsection (b).

58 Pa.C.S. § 3215(c) (emphases added).

The regulations governing applications for a well permit require applicants to submit the applications "electronically to the Department on forms provided through its web site and contain the information required by the Department to evaluate the application." 25 Pa. Code § 78a.15(a). The required information includes information pertaining to specific "public resources[,]" with corresponding obligations to notify any applicable "public resource agency" managing those public resources. *Id.* § 78a.15(f). In turn, other regulations expand on the concepts of "public resources" and "public resource agencies." Beginning with "public resources," the General Assembly did not separately define that term in Act 13, nor did the Agencies in the regulations. Instead, within Section 78a.15(f)(1), the Agencies listed eight specific "public resources," two of which are challenged by the MSC. The first, found in Section 78a.15(f)(1)(iv), is "other critical communities." The term "other critical communities" is defined in the "Definitions" regulation as follows:

*Other critical communities –*

(i) Species of special concern identified on a [Pennsylvania Natural Diversity Inventory ("PNDI")] receipt,[4] including plant or animal species:

---

4 The regulations define "PNDI" as follows:

*PNDI -- Pennsylvania Natural Diversity Inventory --* The Pennsylvania Natural Heritage Program's database containing data identifying and describing this
(continued…)

(A) In a proposed status categorized as proposed endangered, proposed threatened, proposed rare or candidate.

(B) That are classified as rare or tentatively undetermined.

(ii) The term does not include threatened and endangered species.

25 Pa. Code § 78a.1.

The second, found in Section 78a.15(f)(1)(vi), applies to proposed well sites "[w]ithin 200 feet of common areas on a school's property or a playground." Like "other critical communities," the term "common areas of a school's property" was not defined by

---

Commonwealth's ecological information, including plant and animal species classified as threatened and endangered as well as other critical communities provided by the Department of Conservation and Natural Resources, the Fish and Boat Commission, the Game Commission and the United States Fish and Wildlife Service. The database informs the online environmental review tool. The database contains only those known occurrences of threatened and endangered species and other critical communities, and is a component of the Pennsylvania Conservation Explorer.

25 Pa.Code § 78a.1. The regulations further define "PNDI receipt" as "[t]he results generated by the Pennsylvania Natural Diversity Inventory Environmental Review Tool containing information regarding threatened and endangered species and other critical communities." *Id.*

Stated more succinctly, "[r]unning a PNDI search on the Pennsylvania Conservation Explorer[, an online tool,] screens for potentially impacted threatened and endangered species, special concern species, and significant ecological features in the vicinity of a project area. The results of the search are summarized in the PNDI receipt." *See* Pennsylvania Natural Heritage Program website at https://www.naturalheritage.state.pa.us/ApplyingPNHPInformation.aspx (last visited Feb. 23, 2023).

the General Assembly, but it is defined in the regulations. It is defined as "[a]n area on a school's property accessible to the general public for recreational purposes. For the purposes of this definition, a school is a facility providing elementary, secondary or postsecondary educational services." 25 Pa. Code § 78a.1. "Playground" is separately defined as either an "outdoor area provided to the general public for recreational purposes," or "community-operated recreational facilities." *Id.*

If the proposed well "may impact" any of these "public resources," the applicant "shall notify the applicable public resource agency, if any[.]" 25 Pa. Code § 78a.15(f). The notification requirements are delineated by regulation:

> (2) The applicant shall notify the public resource agency responsible for managing the public resource identified in paragraph (1), if any. The applicant shall forward by certified mail a copy of the plat identifying the proposed limit of disturbance of the well site and information in paragraph (3) to the public resource agency at least 30 days prior to submitting its well permit application to the Department. The applicant shall submit proof of notification with the well permit application. From the date of notification, the public resource agency has 30 days to provide written comments to the Department and the applicant on the functions and uses of the public resource and the measures, if any, that the public resource agency recommends the Department consider to avoid, minimize or otherwise mitigate probable harmful impacts to the public resource where the well, well site and access road is located. The applicant may provide a response to the Department to the comments.

25 Pa. Code § 78a.15(f)(2).

As used in the regulations, the term "public resource agency" does not refer exclusively to government entities. *But see* 2 Pa.C.S. § 101 (section of Administrative Law and Procedure title defining "agency" as "a government agency"). Instead, the Agencies defined the term to include both governmental agencies and private actors

(albeit limited to private actors responsible for managing a corresponding regulatory "public resource"):

> An entity responsible for managing a public resource identified in § 78a.15(d) or (f)(1) (relating to application requirements) including the Department of Conservation and Natural Resources, the Fish and Boat Commission, the Game Commission, the United States Fish and Wildlife Service, the United States National Park Service, the United States Army Corps of Engineers, the United States Forest Service, counties, **municipalities and playground owners**.

25 Pa. Code § 78a.1 (emphasis added).

Finally, the regulation codified at 25 Pa.Code § 78a.15(g) specifies that the Department will consider several factors before issuing a permit based on potential impacts to public resources:

> (g) The Department will consider the following prior to conditioning a well permit based on impacts to public resources:
>
> > (1) Compliance with all applicable statutes and regulations.
> >
> > (2) The proposed measures to avoid, minimize or otherwise mitigate the impacts to public resources.
> >
> > (3) Other measures necessary to protect against a probable harmful impact to the functions and uses of the public resource.
> >
> > (4) The comments and recommendations submitted by public resource agencies, if any, and the applicant's response, if any.
> >
> > (5) The optimal development of the gas resources and the property rights of gas owners.

25 Pa. Code § 78a.15(g).

## II. Agency Law

Before examining the specific challenges to these regulations and the Commonwealth Court's opinion, a brief overview of agency law principles is helpful. "Commonwealth agencies have no inherent power to make law or otherwise bind the public or regulated entities. Rather, an administrative agency may do so only in the fashion authorized by the General Assembly[.]" *Nw. Youth Servs., Inc. v. Commonwealth, Dep't of Pub. Welfare*, 66 A.3d 301, 310 (Pa. 2013).

The General Assembly typically authorizes an agency to wield legislative rulemaking powers "by way of recourse to procedures prescribed in the Commonwealth Documents Law, the Regulatory Review Act, and the Commonwealth Attorneys Act." *Id*.[5] "These enactments comprise the core of Pennsylvania's scheme for notice-and-comment rulemaking by administrative agencies and legal and regulatory review by the Attorney General and the Independent Regulatory Review Commission[,]" *id*. at 305 n.2, and regulations promulgated under those circumstances represent "the product of an exercise

---

[5] Legislative rulemaking broadly refers to agencies defining the meaning of statutes and regulations or establishing policy. *Nw. Youth Servs.*, 66 A.3d at 310 (citing Mark Seidenfeld, *Substituting Substantive for Procedural Review of Guidance Documents,* 90 Tᴇx. L. Rᴇv. 331, 335 (2011)). Some conferrals of legislative power are clear; agencies have authority to adopt rules "where the statute specifically empowers the agency to do so." *Marcellus Shale Coal. v. Dep't of Env't Prot.*, 193 A.3d 447, 462 (Pa. Commw. 2018) (quoting *Bailey v. Zoning Bd. of Adjustment of Phila.*, 801 A.2d 492, 500 (Pa. 2002)). In the absence of express legislative authority, an agency can still create rules if "directed to operate under the statute," based on its interpretation of the statute. *Id*. (quoting *Bailey*, 801 A.2d at 500).

Agencies also act in non-legislative capacities. The catch-all term for this branch of administrative law is "guidance documents." *Nw. Youth Servs.*, 66 A.3d at 310. "These come in an abundance of formats with a diversity of names, including guidances, manuals, interpretive memoranda, staff instructions, policy statements, circulars, bulletins, advisories, press releases and others." *Id*. (internal quotation marks and citation omitted). These acts can serve to bind the public, too, because they dictate how the agency carries out its operations, but they lack the formal notice-and-comment procedures.

of legislative power by an administrative agency, pursuant to a grant of legislative power by the legislative body, and [are] valid and as binding upon a court as a statute," *Housing Authority of the County of Chester v. Pennsylvania State Civil Service Commission*, 730 A.2d 935, 942 (Pa. 1999), provided that the rule meets three requirements.

Specifically, the rule must be "(a) adopted within the agency's granted power, (b) issued pursuant to proper procedure, and (c) reasonable." *Tire Jockey Serv., Inc. v. Commonwealth, Dep't of Env't Prot.*, 915 A.2d 1165, 1186 (Pa. 2007) (citation and footnote omitted). Notably, "[p]roperly-enacted legislative rules enjoy a presumption of reasonableness and are accorded a particularly high measure of deference—often denominated *Chevron*[6] deference—by reviewing courts." *Nw. Youth Servs.*, 66 A.3d at 311 (citation omitted).[7] We add that Pennsylvania administrative law principles are rooted in federal precedents. *Id*. at 313 n.16 (noting that "Pennsylvania decisions in the administrative-law field are so closely grounded upon earlier federal cases"); *see also Crown Castle NG E. LLC v. Pa. Pub. Util. Comm'n*, 234 A.3d 665, 686 (Pa. 2020) (Wecht, J., concurring) ("In matters of agency deference, this Court historically has chosen (by volition rather than by command) to take its cues from federal law.") (citations omitted). As noted above, the term "*Chevron* deference" refers to the United States Supreme Court's seminal decision in *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984), which stated that federal law had "long recognized that

---

[6] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984).

[7] Interpretive rules, on the other hand, are afforded "a lesser quantum of deference[.]" *Nw. Youth Servs.*, 66 A.3d at 311–12 (quoting *Pa. Hum. Rels. Comm'n v. Uniontown Area Sch. Dist.*, 313 A.2d 156, 169 (Pa. 1973)). The lesser degree of deference in the guidance documents domain is attributable to the fact that these rules "may not rest on legislatively-conferred rulemaking powers … [and] may depend 'upon the willingness of a reviewing court to say that it in fact tracks the meaning of the statute it interprets.'" *Id.*

considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer[.]" *Id*. at 844 (footnote omitted).

Importantly, when a legislative branch "has directly spoken to the precise question at issue[,]" that unambiguous intent must be followed by both courts and the agency. *Id*. at 842–43. However, where the legislative branch has not directly addressed the issue, a different rule applies:

> If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id*. at 843 (footnotes omitted).

This Court has never declared that we follow federal agency law principles in lockstep. Agency issues appear in a dizzying array of contexts and "[a] pervading question in this field, of course, is how much deference is due in any given context." *Harmon v. Unemployment Comp. Bd. of Rev.*, 207 A.3d 292, 308 (Pa. 2019) (Saylor, C.J, concurring). Various Justices, including the author of this opinion, have expressed the view that our courts should, if not must, depart from federal law in some circumstances. *Id*. at 309 ("In my view, while an administrative agency's interpretation of a statute is one of many factors that a court may consider when interpreting an ambiguous statute, it is not entitled to any deference in the interpretative process.") (Donohue, J., concurring); *id*. at 310 ("As I have explained in the past, I do not agree that reviewing courts should afford what often amounts to unqualified deference—*i.e.*, *Chevron* deference—to an executive-branch agency's interpretation of an ambiguous statute.") (Wecht, J., concurring)

(footnote omitted); *Commonwealth, Dep't of Educ. v. Empowerment Bd. of Control of Chester-Upland Sch. Dist.*, 938 A.2d 1000, 1014 (Pa. 2007) (Baer, J., concurring) ("While I agree that the Secretary enjoys a great deal of latitude in administering the Code, I do not believe that ... administrative interpretations forwarded for the first time in connection with adversarial litigation, are entitled to any more weight than any other litigant's argument[.]").

Our *Crown Castle* decision recognized that this Court has never expressly adopted the federal *Chevron* approach; instead, we have said that *Chevron* "is indistinguishable from our own approach to agency interpretations of Commonwealth statutes." *Crown Castle*, 234 A.3d at 679 n.11 (quoting *Seeton v. Pa. Game Comm'n*, 937 A.2d 1028, 1037 n.12 (Pa. 2007)). While the term *Chevron* does not appear in the briefs, the parties invoke that principle and its rationale. Agencies' Brief at 25 ("Courts must accord deference to an agency promulgating a legislative rulemaking.") (indirectly citing *Chevron*); MSC's Brief at 49 (asserting that even if this Court finds statutory authority, the regulations still fail) ("There is ample evidence in the record and on the face of the regulations to conclude that they fail on the third step as well, in spite of deference that may be given to the Agencies."). As a result, our analysis will draw on federal law for its persuasive value where appropriate.

### III. The Commonwealth Court Decision

The MSC challenged the regulations at issue as "unlawful, illegal, void and unenforceable" for a variety of reasons. Petition for Review, 10/13/2016, at 9, ¶ 34. The fundamental proposition advanced within the Petition was that these regulations served to "inject[] an entirely new, back door, 'pre-permitting' scheme into the oil and gas well

permitting process without statutory authority." *Id*. at 12, ¶ 38. The MSC contended that four specific definitions—public resource agencies, common areas of school property, playgrounds, and other critical communities—are unlawful. "There is no statutory authority for Section 78a.15(f) or the related definitions in Section 78a.1." *Id*. at 14, ¶ 44-a. The MSC argued that "Act 13 does not authorize newly defined 'public resource agencies' or others not referenced in Act 13 to comment upon or object to a well permit application[.]" *Id*. ¶ 44-c. The central premise underlying the MSC's arguments for all four challenges was that, absent express statutory authority, the Agencies were limited to employing the Section 3215 criteria.

The Commonwealth Court acknowledged that substantive rulemaking by agencies is a widely used administrative practice but cautioned that this "authority is not unfettered." *Marcellus Shale Coalition*, 193 A.3d at 462–63.

> Where an agency creates a rule pursuant to its interpretative powers, "a court shall only defer to the rule if it is reasonable and 'genuinely tracks the meaning of the underlying statute.'" *Bailey*, 801 A.2d at 500 (quoting *Borough of Pottstown v. Pennsylvania Municipal Retirement Board*, 551 Pa. 605, 712 A.2d 741, 743 (1998)). A court cannot substitute its own judgment for that of the agency. *Uniontown Area Sch. Dist.*, 313 A.2d at 169. However, no deference is due where an agency exceeds its legal authority or its interpretation is clearly erroneous. *See Tire Jockey*, 915 A.2d at 1186; [*Eagle Environmental II, L.P. v. Department of Environmental Protection*, 884 A.2d 867, 878 (Pa. 2005)]

*Id.* at 462–63.

The Commonwealth Court began its substantive analysis by addressing the statutory authority conferring legislative rulemaking powers to the Agencies. Section 3274 contains an express grant: "The Environmental Quality Board shall promulgate

regulations to implement this chapter." 58 Pa.C.S. § 3274. Additionally, Sections 3211 and 3212 "provide express requirements for well permit applicants to provide notice to certain enumerated parties and objection opportunities for a subset of such parties." *Marcellus Shale Coalition*, 193 A.3d at 465; *see also* 58 Pa.C.S. §§ 3211–3212. Additionally, the Commonwealth Court recognized that the "[w]ell location restrictions" codified at Section 3215 were a pertinent source of authority. *See* 58 Pa.C.S. § 3215.

<u>"Other critical communities"</u>

Starting with the Agency's definition of "other critical communities," the panel explained that the Chapter 78a defined the term for the first time to include any "species of special concern" as identified on a PNDI receipt. The panel addressed the validity of the regulation by reference to traditional tenets of statutory construction. "What the General Assembly meant by 'other critical communities' and whether the regulatory definition of this term exceeds the scope of the statute is a matter of statutory construction." *Marcellus Shale Coalition*, 193 A.3d at 470–71. The Commonwealth Court stated that its analysis was "also guided by the doctrine of ejusdem generis, which means 'of the same kind or class.'" *Id*. at 472 (quoting *Dep't of Env't Prot. v. Cumberland Coal Res., LP*, 102 A.3d 962, 976 (Pa. 2014)).

The court commenced its analysis by observing that "key modifiers of the specified items are 'rare,' 'endangered' and 'critical.'" *Id*. Additionally, the panel observed that the term "other critical communities" had not appeared in other statutory contexts, but the term "critical habitat" has. *Id.* Using the common and approved usage of those terms, the court essentially concluded that the General Assembly intended consideration of something threatened with extinction or in a crisis state.

The opinion then applied the ejusdem generis canon of construction to determine whether the Agencies' regulatory term "species of special concern" within the definition of "other critical communities" was "of the same general nature or class as the statutory items listed" in Section 3215(c). *Id*. at 473. It determined that the regulatory definition was "not quite on par with the statute's terms," and that the regulation itself states that "species of special concern" refers to species that are "'proposed' to be endangered or threatened, or their status is undetermined." *Id*. Therefore, "[i]t does not appear that 'species of special concern' is of the same general nature or class as the statutory items listed." *Id*.

The court concluded that its interpretation was logical "when one considers the purpose of Act 13 and the balance that must be struck between oil and gas and environmental interests." *Id*. at 475. The court cited the purpose of the Act, which is "to permit the optimal development of oil and gas resources in this Commonwealth consistent with the protection of the health, safety, natural resources, environment and property of the citizenry." *Id*. (citing 58 Pa.C.S.§ 3802). "By creating obligations tied to species of special concern, which are not at the same level of risk as threatened or endangered species, the regulation upsets the balance between industry and the environment strived for in Act 13." *Id*. at 476.

The Commonwealth Court also determined that the regulatory definition of "other critical communities" violates the Documents Law, 45 P.S. §§ 1102-1208. Citing 45 P.S. §§ 1201 (explaining the public notice requirements that an agency must follow when it promulgates, amends, or repeals an administrative regulation) and 1202 (stating, inter alia, that, before an agency takes action on or changes a regulation, it must review and

consider written comments and hold public hearings), the intermediate court observed that the Documents Law mandates that an agency must enact a regulation through formal notice and comment procedures to ensure that the regulation has the full force of law; otherwise, the regulation is a nullity. *Id.* The court opined that, here, "the requirements related to 'species of special concern' identified on a PNDI receipt violate the Documents Law because they create a binding norm through a changing PNDI database that is not populated through notice and comment rulemaking procedures."[8] *Id.* at 477.

The Commonwealth Court bolstered this conclusion by highlighting that, unlike resources included in the PNDI database, threatened and endangered species must endure formal regulatory review procedures. According to the court, "provisions tied to the PNDI receipt effectively allow third parties to make changes to the regulation without meeting the requirements of formal rulemaking." *Id.* These third parties include the Department of Conservation and Natural Resources, the Game Commission, the Fish

---

[8] This Court has explained the term "binding norm" as follows:

> The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings. .. . A properly adopted substantive rule establishes a standard of conduct which has the force of law. . . . The underlying policy embodied in the rule is not generally subject to challenge before the agency.

> A general statement of policy, on the other hand, does not establish a 'binding norm'. . . . A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

Pennsylvania Human Relations Comm'n v. Norristown Area Sch. Dist., 374 A.2d 671, 679 (1977) (footnote and internal quotation marks omitted) (quoting *Pacific Gas and Electric Co. v. Federal Power Commission*, 506 F.2d 33, 41 (D.C.Cir. 1974)).

and Boat Commission, and the Pennsylvania field office of the United States Fish and Wildlife Service.

The Commonwealth Court reasoned that the "insertion of obligations tied to an ever-changing list of species creates requirements that evolve over time while evading public notice and comment rulemaking." *Id.* In the intermediate court's view, the regulation improperly evades "rulemaking formalities by engaging in policymaking through non-legislative avenues." *Id.* The court, therefore, held that the "special concern species" provisions violate the Documents Law.

<u>"Common areas of a school's property and a playground"</u>

The Commonwealth Court next addressed whether the requirement "to identify and provide information concerning 'common areas of a school's property or a playground' in a well permit application as well as the definition of these terms in Section 78a.1 is unlawful and unenforceable." *Id*. at 478. As with the foregoing analysis, the court addressed whether "common areas of a school's property and a playground" were of the same kind or class as the items contained in the General Assembly's statutory list of "public resources." *Id.* The court determined that the statutory items were all of the same general class or nature "in that they are all public in nature, albeit not necessarily publicly owned." *Id*. at 479. For example, buildings on the historic register "may be located on privately owned property, but they are not purely private property." *Id*. (citing *Robinson Township*, 83 A.3d at 955). It reasoned, however, that these two items–the common areas of a school's property and a playground–were not of the same class:

> Although common areas of a school's property and playgrounds may share some similarities with the public resources listed in Section 3215(c), we agree with the [MSC] that they are not within the "same general class or nature as"

their statutory counterparts. With regard to schools, virtually any school would fall within the definition of "school," such as career and technical centers, culinary schools, charter schools, community colleges, private-licensed school, driver-training school, vocational schools, etc. The list is seemingly endless as any institution providing some form of educational services would ostensibly qualify as a "school" under the regulatory definition. As for the recreational aspect, a mere picnic table and bench or basketball hoop accessible to the public would bring the school's property within the purview of the regulation.

As for playgrounds, again the definition is so broad as to defy quantification and compliance. The definition embraces publicly and privately owned "playgrounds." It obviously includes children's playgrounds, sports fields, and picnic sites. However, it also includes virtually any area open to the public for recreational purposes, including commercial enterprises, such as shopping centers, movie theaters, sports stadiums, amusement parks, and golf courses. Even a playground adjoining a McDonald's eatery would qualify as a "public resource" under the regulation. The sheer diversity of these resources renders the regulation unreasonable.

*Id*. at 480–81.

Playground owners and municipalities as "public resource agencies"

Finally, the Commonwealth Court determined that the Agencies' definition of "playground owners" as a "public resource agency" entitled to comment exceeded the scope of the statute. It also determined that "municipalities" could be defined as a "public resource agency," but struck the regulation requiring the Department to consider municipality input.

Beginning with the latter regulation, the Commonwealth Court held that Section 78a.15(g)(4) was invalid. The regulatory definition of "public resource agency" includes municipalities, and thus, this regulation requires the Department to consider any comments submitted by the municipality. With respect to municipalities, the

Commonwealth Court explained that subsection (d) of Section 3215 is a specific grant of statutory authority for agency action regarding municipality comments. However, in *Robinson Township*, this Court held that Section 3215(d) was unconstitutional because it did not obligate the Department to consider comments from municipalities. *Marcellus Shale Coalition*, 193 A.3d at 483 (citing *Robinson Township*, 83 A.3d at 984). The Commonwealth Court observed that the regulation "appears to succeed where Section 3215(d) of Act 13 failed by providing that the Department 'will' consider such comments and recommendations," but "because the Supreme Court enjoined application and enforcement of Section 3215(d), there is no statutory authority for the regulation." *Id*. at 484. Absent statutory authority, that portion of the regulation failed.

Separately, the Commonwealth Court examined whether the definition of "public resource agency" was valid. As to the inclusion of municipalities, the court determined that its inclusion "is within the power bestowed under Act 13" because, as a local governmental unit, a municipality has trustee duties under the Environmental Rights Amendment.[9] *Id.* at 485. That regulation was also reasonable because identifying the

---

[9] This provision of the Pennsylvania Constitution states as follows:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, § 27. This Court has explained that "[Article I, Section 27] establishes the public trust doctrine with these natural resources (the corpus of the trust), and designates 'the Commonwealth' as trustee and the people as the named beneficiaries." *Robinson Township*, 83 A.3d at 956; *see also Pa. Env't Def. Found. V. Commonwealth*, (continued…)

municipality in which the well will be located is readily ascertainable. "Municipalities have identifiable points of contact for notification purposes. Thus, the inclusion of municipalities in the definition is not unreasonable." *Id*.

The Commonwealth Court struck the inclusion of playground owners as a public resource agency upon consideration of the same concepts. Unlike municipalities, playground owners "are not 'trustees' with any duties or obligations to protect the environmental trust under Article I, Section 27 of the Pennsylvania Constitution or Act 13. The Agencies have no authority to elevate private entities as public agencies responsible for ensuring the public trust." *Id.* The Commonwealth Court added:

> Moreover, playground owners are not readily identifiable. For starters, the regulatory definition bears an internal ambiguity. The actual "owner" of the playground may not necessarily be the "entity responsible for managing" the playground. *See* 25 Pa. Code § 78a.1. For instance, a playground may be owned by one entity and managed by another. Under the definition, it is unclear which would be the "public resource agency" for notification purposes.
>
> Under either interpretation, identifying and notifying the appropriate contact may be impossible, if not extremely burdensome. Unlike the other public resources listed in Section 3215(c), "playgrounds" are not governed by singular government agencies that can be easily identified and notified during the well permitting process. A "playground owner" may be a corporation, homeowners' association, estate, trust, or private citizen. Even if the playground owner is identified, the point of contact for such private "owners" may be unknown, unidentified, or unlisted. Requiring a permit applicant to identify and notify "playground owners" is unduly burdensome and unreasonable. And, considering our problem with the regulatory definition of "common areas of a

---

161 A.3d 911, 931–32 (Pa. 2017) ("The third clause of Section 27 establishes a public trust, pursuant to which the natural resources are the corpus of the trust, the Commonwealth is the trustee, and the people are the named beneficiaries.") (footnote omitted).

school's property" and "playgrounds," as discussed above, the definition of "public resource agency" to the extent it includes owners of such recreational areas fails by extension. For these reasons, we conclude that the addition of "playground owners" as a public resource agency is unlawful and unenforceable.

*Id*. (footnote omitted).

## IV. Issues Presented

The Agencies appealed and present the following questions for our review:

a. Did the Commonwealth Court improperly grant partial summary relief by declaring that the definitions of "other critical communities," "common areas of a school's property," and "playground," as set forth in 25 Pa. Code § 78a.1, are void and unenforceable?

b. Did the Commonwealth Court improperly grant partial summary relief by declaring that including "playground owners" in the definition of "public resource agency," as set forth in 25 Pa. Code § 78a.1, is void and unenforceable?

c. Did the Commonwealth Court improperly grant partial summary relief by declaring that the Department's consideration of comments and recommendations submitted by municipalities as "public resource agencies," as provided for in 25 Pa. Code § 78a.15(g), is unconstitutional and unenforceable because the Supreme Court's decision in *Robinson Township v. Commonwealth* … invalidated … Section 3215(d)?

Agencies' Brief at 4.

## V. Parties' Arguments

### Agencies

The Agencies assert that the Commonwealth Court misapplied agency law principles by employing principles germane only to interpretive, rather than legislative, rulemaking. A regulation adopted under legislative powers "is valid and binding upon courts as a statute so long as it is (a) adopted within the agency's granted power, (b)

issued pursuant to proper procedure, and (c) reasonable." *Tire Jockey*, 915 A.2d at 1186. The Agencies point out that the regulations went through all legislative rulemaking requirements, Agencies' Brief at 20–21, and the Commonwealth Court rejected the MSC's claim that the promulgation procedure was flawed. Therefore, the first two prongs are satisfied, and the only remaining question was whether the challenged regulations are reasonable.

The Agencies argue that when examining the challenged definitions, the Commonwealth Court did not address the reasonableness of the regulations. Instead, the court "improperly commingled the legislative and interpretative rulemaking tests." *Id.* at 21. This is evident from the opinion's conclusion that the Agencies' regulations "do[ ] not track the statute," which the Agencies state is a concept relevant only to interpretive rulemaking. *See Pa. Hum. Rels. Comm'n v. Uniontown Area Sch. Dist.*, 313 A.2d 156, 169 (Pa. 1973) ("An interpretative rule … depends for its validity not upon a law-making grant of power, but rather upon the willingness of a reviewing court to say that it in fact tracks the meaning of the statute it interprets."). Here, though, the question is not whether the Agencies' expansion of "public resources" tracks the meaning of the statute enacted by the legislature but instead simply whether the Agencies were authorized to add items to the list of "public resources" and "public agencies," and, if so, whether the additions were reasonable.

Viewing the legal question as a pure question of legislative rulemaking, the Agencies argue that their Chapter 78a regulations constituted a valid exercise of their authority, which was granted to the Agencies via several statutory sources. *See* Agencies' Brief at 22. The Agencies cite *Eagle Environmental II, L.P. v. Department of*

*Environmental Protection*, 884 A.2d 867 (Pa. 2005), as a case establishing that agencies can have broad powers based on statutory purpose. *Eagle Environmental* "established two core principles of administrative law. First, a regulation, by definition, may, and should, be more detailed and specific than a statute. Second, a regulation falls within an agency's granted authority so long as it is encompassed by the intended purposes of the statute and the agency's rulemaking authority." Agencies' Brief at 25 (citing *Eagle Environmental*, 884 A.2d at 879). The Agencies contend that the challenged regulations are encompassed by the intended purposes of the Oil and Gas Act.

The Agencies then ask this Court to determine that the regulations are reasonable. They emphasize that because the General Assembly conferred "broad rulemaking authority[,]" the regulations are entitled to great deference. The Agencies explain in detail how the regulations are consistent with the purposes of the authorizing statutes. They contend that each challenged definition serves a screening function that ensures that the Department possesses all the information it needs to consider potential impacts of a proposed unconventional well. The Agencies state that they must consider a large amount of data to protect the public from the potential harms from drilling activities, and the Agencies also note that they have constitutional duties related to the Article I, Section 27 trust. The information demanded by the regulations facilitates the balancing that is the purpose of the Oil and Gas Act.

The panel's determination that the terms were void and unenforceable stemmed, in the Agencies' view, from its failure to recognize that the Agencies possessed broad legislative rulemaking authority. The Commonwealth Court could strike down the regulations under the first prong of the legislative rulemaking test only if the Agencies

exceeded their powers. If the Agencies did not exceed those powers, then the balance to be struck between oil and gas development and environmental interests is for the agency to decide.

The Agencies additionally assert that their definition of "other critical communities" is a reasonable implementation of their obligations. A deputy secretary testified that the "other critical communities" definition promulgated "codif[ied] the practice in place prior to the rulemaking." Agencies' Brief at 40. Additionally, the PNDI database itself reflects decisions from other agencies—the Department of Conservation and Natural Resources, Pennsylvania Fish and Boat Commission, and the Game Commission—that certain species are of concern. The Agency's decision to adopt their views "reflects a measured and appropriate extension of the non-exhaustive statutory list under Section 3215(c) due to the features they share with other listed resources." *Id*.

Regarding the Commonwealth Court's conclusion that this portion of the regulations violates the Documents Law, the Agencies characterize the court's interpretation of this act as "extreme." *Id.* at 44. The Agencies agree that the Documents Law dictates that agencies must give public notice when they intend to promulgate, amend, or repeal regulations. Indeed, the Agencies observe that, "[w]hen an agency creates a 'binding norm,' for example through a policy statement or guidance document, without following this formal rule making process, it is considered an improperly promulgated regulation, beyond an agency's authority." *Id.*

The Agencies submit that the Commonwealth Court erred by concluding that their incorporation of the PNDI process in the definition of "other critical communities" created an improper "binding norm." The Agencies note that PNDI receipts will be unique to every

potential well site; however, they suggest that the court incorrectly concluded that this type of process in a regulation can be characterized as imposing an improper binding norm simply because the outcomes of the process will vary on a case-by-case basis.

Regarding the inclusion of "municipalities and playground owners" as public resource agencies, the Agencies reiterate their fundamental argument that their regulatory powers are quite broad, and there were viable statutory sources of authority for these regulations.

MSC

The MSC responds that the Commonwealth Court did not commingle the legislative and interpretative tests as indicated by the opinion's structure. It argues that the court clearly distinguished legislative rulemaking "from interpretive rulemaking. The [c]ourt structured its opinion by beginning its analysis of each issue under the heading 'Statutory Authority' and then determining [sic] whether the Agencies had legislative authority for the challenged regulation under the first step of the legislative rulemaking standard." MSC's Brief at 10-11 (citation omitted). Additionally, if the court "used an interpretive rulemaking standard of review, it would have discussed whether the Department's regulations 'merely explain or offer specific conforming content' to Act 13 or existing regulations." *Id.* at 13. Thus, the MSC argues, the Commonwealth Court did not fundamentally misapply agency law.

The MSC submits that the Commonwealth Court correctly decided that the Agencies exceeded their statutory authority. "The heart of the question on appeal is whether the General Assembly granted the [Agencies] the authority to promulgate their new regulatory definitions of 'common areas of a school's property,' 'playground,' 'other

critical communities' or 'public resource agency' in 25 Pa. Code § 78a.1[.]" MSC's Brief at 13. According to the MSC, the new regulatory definitions "substantially alter the well permit application process[.]" *Id.* Addressing the legislative grant of rulemaking authority, the MSC argues that the Commonwealth Court's result is correct. The MSC cites *Insurance Federation of Pennsylvania v. Commonwealth, Department of Insurance*, 889 A.2d 550, 555 (Pa. 2005), *Deoria v. State Athletic Commission*, 962 A.2d 697 (Pa. Commw. 2008), and *Rand v. Pennsylvania State Board of Optometry*, 762 A.2d 392 (Pa. Commw. 2000), as three cases establishing that agencies must be clearly authorized to wield the asserted powers.

The MSC describes *Eagle Environmental* as expressing "a narrower statement of the necessary evaluation of statutory authority," which relied on the purpose of the statute and its reasonable effects. MSC's Brief at 15. It further distinguishes *Eagle Environmental* on several grounds, as discussed later in more detail. The MSC also avers that a "delegation of rulemaking power must be 'clear and unmistakable' because a 'doubtful power does not exist.'"*Id.* at 17 (citation omitted). As to the interaction between the regulatory definition of "other critical communities" and the Documents Law, the MSC essentially agrees with the Commonwealth Court's conclusion that the regulation violates the law due to the fluid nature of the PNDI database and the fact that changes to the database are not subject to any notice or comment requirements. MSC's Brief at 38-42; *id.* at 49-52.

## VI. Analysis

Although stressed by the Agencies, we do not find it helpful to parse the Commonwealth Court's analysis to determine whether it "commingled" the legislative

rulemaking or interpretive rulemaking tests. This type of analysis loses sight of the key question, which is simply whether the Agencies acted within their statutory grant of authority. If the statute makes a clear grant of authority, then neither a court nor the agency can disregard the clearly expressed intent of the General Assembly.

The Agencies argue that this is a legislative rulemaking case and not an interpretive rulemaking case. The MSC acknowledges that point and insists that the Agencies want to skip to reasonableness review without addressing statutory authority. Whether we label this a legislative rulemaking dispute or an interpretive rulemaking dispute (with the relevant interpretation involving the statutes that purportedly authorize the legislative rulemaking), at the end of the day the **only** point that matters is whether the Agencies were authorized to act.

The Agencies unquestionably have the authority to promulgate regulations, and therefore we must simply determine how much regulatory leeway the General Assembly intended to confer. *See* Agencies' Brief at 14 (stating that the "Commonwealth Court failed to analyze the Public Resource Definitions in accordance with *Tire Jockey*"); MSC's Brief at 10 (explaining that "MSC agrees this is case of legislative rulemaking"). Provided that the Agencies were authorized to promulgate the regulations, the regulations are valid so long as they are reasonable. *See Tire Jockey Serv., Inc.,* 915 A.2d at 1186.

**A.**

**<u>Statutory ability to define "public resources"</u>**

The first issue relates to whether the Commonwealth Court erred by striking the Agencies' definitions of "other critical communities," "common areas of a school's

property," and "playground." Each of these definitions involves 25 Pa. Code §§ 78a.15 and 78a.1. For ease of discussion, we review the relevant language here.

Section 78a.15(f)(1) applies to an "applicant proposing to drill a well at a location that may impact a public resource," followed by eight items that qualify as a "public resource." *See* 25 Pa. Code §§ 78a.15(f)(1)(i)-(viii). Of these eight, the MSC challenged two. The first is Section 78a.15(f)(1)(iv), which applies to well permits "[i]n a location that will impact other critical communities." The second challenged definition is set forth at Section 78a.15(f)(1)(vi) and applies to proposed well sites "[w]ithin 200 feet of common areas on a school's property or a playground." The definitions section of the regulations defines the key terms "other critical communities," "common areas of a school's property," and "playground." *See* 25 Pa. Code § 78a.1.

This Commonwealth follows the *Chevron* approach, which asks at the outset whether the General Assembly "has directly spoken to the precise question at issue. If the intent … is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent[.]" *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). The Commonwealth Court's analysis ascertained a limitation on the Agencies' regulatory authority in Act 13 by the General Assembly's use of the phrase "including, but not limited to" in Section 3215(c). To determine whether the General Assembly clearly limited the Agencies' ability to define additional "public resources" by the use of this phrase, we naturally begin with the statutory text.

"Our standard of review for questions of statutory interpretation is de novo and our scope of review is plenary." *Matter of Priv. Sale of Prop. by Millcreek Twp. Sch. Dist.*,

185 A.3d 282, 290 (Pa. 2018) (citation omitted). "In general, the best indication of legislative intent is the plain text of the statute." *Commonwealth v. Griffith*, 32 A.3d 1231, 1235 (Pa. 2011). This raises the question of what statutory provision is being examined. The General Assembly conferred broad regulatory powers upon the Agencies, as indicated by Section 3274's express grant: "The Environmental Quality Board shall promulgate regulations to implement this chapter." 58 Pa.C.S. § 3274.

However, regarding these three challenged definitions, the focus throughout this litigation has understandably centered on Section 3215 ("Well location restrictions"), and its instruction to the Agencies to "consider the impact of the proposed well on public resources," followed by the generic language "included, but not limited to," which is then followed by six specific items.[10] 58 Pa.C.S. § 3215(c). In the absence of other statutory language, the broad grant within Section 3274 may serve as the enabling statute, arguably lessening the need to closely scrutinize what effect Section 3215 has within the

---

[10] For ease of reference, we repeat the six items:

> (1) Publicly owned parks, forests, game lands and wildlife areas.
>
> (2) National or State scenic rivers.
>
> (3) National natural landmarks.
>
> (4) Habitats of rare and endangered flora and fauna and other critical communities.
>
> (5) Historical and archaeological sites listed on the Federal or State list of historic places.
>
> (6) Sources used for public drinking supplies in accordance with subsection (b).

58 Pa.C.S. § 3215(c)(1)–(6).

broader legislative scheme. However, Section 3215(e) specifically directs the Board to develop regulatory criteria concerning "public resources:"

> **(e) Regulation criteria.--**The Environmental Quality Board shall develop by regulation criteria:
>
> (1) For the department to utilize for conditioning a well permit based on its impact to the public resources identified under subsection (c) and for ensuring optimal development of oil and gas resources and respecting property rights of oil and gas owners.
>
> (2) For appeal to the Environmental Hearing Board of a permit containing conditions imposed by the department. The regulations shall also provide that the department has the burden of proving that the conditions were necessary to protect against a probable harmful impact of the public resources.

58 Pa.C.S. § 3215(e).

By specifically instructing the Agencies to develop criteria for "conditioning a well permit based on its impact to the public resources identified under subsection (c)," the General Assembly imposed a requirement, on the otherwise broad conferral of regulatory powers. In practical effect, this requirement functions as a limitation of sorts; absent subsection (e), the Agencies would, as far as the regulatory statutory scheme is concerned, be free to ignore any potential impacts to "public resources." Its presence requires the Agency to develop specific regulatory criteria concerning "the public resources identified under subsection (c)[.]" *Id.* The consequent question is whether Section 3215 operates as any limitation on the Agencies' powers to add "public resources" other than those specified in subsection (c).

To answer that, we agree with the Commonwealth Court that we must determine whether Sections 3215(c) and (e) reflect unambiguous expressions of legislative intent precluding the challenged definitions. The Commonwealth Court apparently concluded that Section 3215(c) was an unambiguous limitation, largely by applying an ejusdem generis analysis to determine whether the "public resources" added by the Agencies were sufficiently similar to the six items selected by the General Assembly such that the General Assembly would have approved of the Agencies' additions. *See Marcellus Shale Coalition*, 193 A.3d at 472 ("[I]tems that are not of the same general nature or class as those enumerated should not be included. The critical inquiry is whether items are of the 'same general class or nature' as the included items.") (citations omitted). The MSC asks the Court to accept the ejusdem generis analysis as revealing the definitive manifestation of legislative intent. "The Commonwealth Court correctly followed this Court's instruction regarding the interpretation of non-exhaustive lists and applied the doctrine of ejusdem generis in recognizing that statutory authority 'is not unfettered.'" MSC's Brief at 23.

The difficulty with this position is that the MSC does not argue that the Agencies were categorically prohibited from defining additional "public resources." Instead, the MSC claims that the additional items exceed the statutory bounds via the ejusdem generis doctrine. Yet, the General Assembly easily could have eliminated any question regarding the scope of the Agencies' authority by drafting language such as: "On making a determination on a well permit, the department shall consider the impact of the proposed well on the following public resources." That neither Section 3215 nor any other statutory

provision explicitly binds the Agencies to a "floor" invariably means that the Agencies were permitted to go farther.[11]

**B.**

**Statutory "public resources" and the Environmental Rights Amendment**

Before addressing the role of the "including, but not limited to" language and the ejusdem generis doctrine, we first discuss the factor that we deem decisive in ascertaining legislative intent. The Commonwealth Court recognized that the term "public resources" is rooted in the Environmental Rights Amendment ("ERA"). The "statutory concept of 'public resources' embodied in Act 13 and the Public Resource Regulations derives from Article I, Section 27 of the Pennsylvania Constitution." *Marcellus Shale Coalition*, 193 A.3d at 469. Indeed, Act 13 expressly states that one of its purposes is to "[p]rotect the natural resources, environmental rights and values secured by the Constitution of Pennsylvania." 58 Pa.C.S. § 3202(4).

Importantly, in *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 161 A.3d 911, 931 (Pa. 2017), a majority of this Court adopted the *Robinson Township* framework and held that the ERA "grants two separate rights to the people of this Commonwealth." One is the "'right' of citizens to clean air and pure water, and to the preservation of natural, scenic, historic and esthetic values of the environment."

---

[11] The dissent agrees with our conclusion that the General Assembly intended to imbue the Board with the authority to promulgate regulations pursuant to Act 13. Dissenting Opinion at 2. Yet, despite that agreement and Section 3215(e)'s clear instruction that the Board must develop regulatory criteria for the Department "to utilize for conditioning a well permit based on its impact to the public resources identified under subsection (c)[,]" the dissent contends that, "[b]y its clear language, … Section 3215(c) does not grant the Board authority to define 'public resources' as it is used in Section 3215(c) or to add additional resources to those listed." *Id.* at 4-5 (footnote omitted). The dissent's position seems to ignore the statutory language "including but not limited to" in Section 3215(c).

*Robinson Township v. Commonwealth*, 83 A.3d 901, 951 (Pa. 2013). The ERA as a whole "accomplishes two primary goals, via prohibitory and non-prohibitory clauses: (1) the provision identifies protected rights, to prevent the state from acting in certain ways, and (2) the provision establishes a nascent framework for the Commonwealth to participate affirmatively in the development and enforcement of these rights." *Id.* at 950.

The first clause of the ERA, which establishes the first right of the citizens, "affirms a limitation on the state's power to act contrary to this right. While the subject of the right certainly may be regulated by the Commonwealth, any regulation is 'subordinate to the enjoyment of the right[.]'" *Id*. at 951 (citations omitted).

> The terms "clean air" and "pure water" leave no doubt as to the importance of these specific qualities of the environment for the proponents of the constitutional amendment and for the ratifying voters. Moreover, the constitutional provision directs the "preservation" of broadly defined values of the environment, a construct that necessarily emphasizes the importance of each value separately, but also implicates a holistic analytical approach to ensure both the protection from harm or damage and to ensure the maintenance and perpetuation of an environment of quality for the benefit of future generations.
>
> Although the first clause of Section 27 does not impose express duties on the political branches to enact specific affirmative measures to promote clean air, pure water, and the preservation of the different values of our environment, the right articulated is neither meaningless nor merely aspirational. The corollary of the people's Section 27 reservation of right to an environment of quality is an obligation on the government's behalf to refrain from unduly infringing upon or violating the right, including by legislative enactment or executive action.

*Id*. at 951–52.

The second clause deliberately "left unqualified the phrase public natural resources, suggesting that the term fairly implicates relatively broad aspects of the

environment, and is amenable to change over time to conform, for example, with the development of related legal and societal concerns." *Id*. at 955. "The drafters seemingly signaled an intent that the concept of public natural resources would be flexible to capture the full array of resources implicating the public interest, as these may be defined by statute or at common law." *Id*.

This Court has not been asked to definitively resolve what would qualify as a "public resource," and it is perhaps impossible to do so. The ERA "directs the 'preservation' of broadly defined values of the environment, a construct that necessarily emphasizes the importance of each value separately, but also implicates a holistic analytical approach" to protect the environment. *Id*. at 951. The six delineated "public resources" in Section 3215(c) reflect this holistic approach, as the General Assembly did not instruct the Agencies to develop criteria to protect "clean air" or the "esthetic values" of the environment.

Instead, it chose to define six specific items that do not share any obvious commonalities. The inclusion of "[p]ublicly owned parks, forests, game lands and wildlife areas," i.e., governmental property used for recreation and enjoyment of nature, has little in common with privately-owned structures that are the subject of other provisions. As this Court recently explained in *U.S. Venture, Inc. v. Commonwealth*, 255 A.3d 321 (Pa. 2021), the term "public" can, in context, refer either to government-owned or something that is open to or otherwise accessible by the general public. *Id*. at 331. Section 3215(c) includes items that could be closed to the public, and the Commonwealth Court's observation that the statutory items "are not purely private property" is at least partially incorrect.

Consider (c)(3), "National natural landmarks."  The federal National Natural Landmarks Program's website states that nearly one-third of the 602 current National Natural Landmark sites are owned by private parties.[12]  Likewise, the statutory (c)(5) item refers to historical and archaeological sites on the Federal or State list of historic places. By way of example, Fallingwater, the famous home designed by Frank Lloyd Wright, is on the federal registry and was donated by the Kaufmann family to the nonprofit conservation organization Western Pennsylvania Conservancy.  While that organization permits the public to tour the home and its grounds, that benefit is due to the generosity of the Kaufmann family and the Western Pennsylvania Conservancy.[13]  Thus, the statutory list includes buildings owned by private actors, with no apparent requirement that the public be allowed to access the resource at all.

The ERA's conception of "public resources" as embracing "broadly defined values of the environment," *Robinson Township*, 83 A.3d at 951, which includes historic and esthetic values, comports with the items enumerated by the General Assembly in Section 3215(c).  Its list of "public resources" does not neatly break down into "purely private" and "purely public" categories.  As shown, even a privately-owned piece of property closed to

---

[12]      NAT'L PARK SERV., *National Natural Landmarks Directory,* https://www.nps.gov/subjects/nnlandmarks/nation.htm (last visited Nov. 23, 2022).

[13] Edgar Kauffman Jr.'s remarks on why the family donated the property eloquently describe the transformation of a private residence to a "public resource."

> Such a place cannot be possessed. It is a work of man for man; not by a man for a man. Over the years since it was built, Fallingwater has grown ever more famous and admired, a textbook example of modern architecture at its best. By its very intensity it is a public resource, not a private indulgence.

W. PA. CONSERVANCY, *Fallingwater*, https://waterlandlife.org/entrusted-wpc-1963/ (last visited Nov. 23, 2022).

the public can qualify as a "public resource" per Section 3215(c).  In light of the ERA, this is not surprising.  Its concept of "public resources" encompasses resources essential to the quality of the life of Pennsylvania citizens, a concept that is not cabined by public or private ownership.

Nor is it cabined by natural or man-made categories. The Concurring Opinion challenges the premise that Section 3125(c) has anything whatsoever to do with the ERA, apparently concluding that it is absurd to find that Section 3125's reference to "public resources" has anything to do with the "public natural resources" protected by the ERA. *See* Concurring Op. at 12 (Wecht, J.) (accusing the Majority of "stuffing Section 3125(c) into the ERA's ill-fitting clothes").

We respectfully disagree with our learned colleague.  If the ERA is an ill-fit, the General Assembly did not think so; it declared that one of the purposes of Act 13 is to "[p]rotect the natural resources, environmental rights and values secured by the Constitution of Pennsylvania."  58 Pa.C.S. § 3202(4).  It is difficult to imagine what provision of our charter that the General Assembly referenced if not the ERA.  It is consistent with the ERA's holistic approach and Act 13's declared purpose of protecting "values secured by the Constitution of Pennsylvania" to conclude that the reference to "public resources" in Section 3215(c), while not parroting the ERA's language, was designed to afford the Agencies a great degree of leeway in adding additional "public resources" consistent with the constitutional provision.

The assertion that an architectural masterpiece like Fallingwater is obviously **not** protected by the ERA is startling.  Concurring Op. at 12*.*  In the Concurrence's view, Gettysburg could be described as a mere tract of land or the Liberty Bell a decorative

adornment. But for decades, this Court has recognized that the ERA "reflects a state policy encouraging the preservation of historic and aesthetic resources." *United Artists' Theater Cir., Inc. v. City of Philadelphia*, 635 A.2d 612, 620 (Pa. 1993); *id.* (concluding that an ordinance was consistent with the ERA because it was dedicated to preserving and protecting "buildings, structures, sites, objects, and districts of historic, architectural, cultural, archeological, educational and aesthetic merit"); *see also Commonwealth v. Nat'l Gettysburg Battle Tower, Inc.*, 311 A.2d 588, 592 (Pa. 1973) (opining that, after ratification of the ERA, "for the first time, at least insofar as the state constitution is concerned, the Commonwealth has been given power to act in areas of purely aesthetic or historic concern[]").

Suggesting that a site such as Fallingwater is not protected by the ERA rolls back almost 50 years of precedent by reading out of the ERA any protection of historic or aesthetic value that is created by humans. We, on the other hand, honor our precedent and recognize that the General Assembly intended to permit the Agencies, in exercising their fiduciary duties, to add items that "fall within the ERA's conception of a 'public resource.'" Majority Op. at 39.

For its part, the Commonwealth Court recognized that the term "public resource" derives from the ERA. However, in resolving the question of legislative intent, the Commonwealth Court did not consider that the General Assembly, by using statutory language referencing the ERA's conception of "public resources," which itself is broad and undefined, intended for the Agencies to have a large degree of regulatory flexibility

in defining those additional resources.[14]  Moreover, it is consistent with legislative intent to interpret the statutory term "public resources" in a fashion consistent with the ERA because both the General Assembly and the Agencies are themselves trustees under the ERA.  *See Pa. Env't Def. Found.*, 161 A.3d at 931 n.23 ("Trustee obligations are not vested exclusively in any single branch of Pennsylvania's government, and instead all agencies and entities of the Commonwealth government, both statewide and local, have a fiduciary duty to act toward the corpus with prudence, loyalty, and impartiality.").  The fact that the Agencies are required to consider their trustee duties in making decisions on well permits supports the conclusion that the General Assembly, in listing specific items within Section 3215(c) that defy categorization as privately-owned or publicly-accessible, intended for the Agencies to provide additional protections geared towards protecting the quality of life of Pennsylvania citizens and otherwise effectuating the ERA's purpose.[15]

---

[14] Stated differently, the Commonwealth Court failed to recognize that the term "public resources" has acquired a peculiar and appropriate meaning in Pennsylvania constitutional jurisprudence.  Accordingly, the Statutory Construction Act instructs that this term must "be construed according to such peculiar and appropriate meaning or definition."  1 Pa.C.S. § 1903(a).

[15]  Simultaneously, the ERA does not foreclose industrial development.  "[R]ather, as with the rights affirmed by the first clause of Section 27, the duties to conserve and maintain are tempered by legitimate development tending to improve upon the lot of Pennsylvania's citizenry, with the evident goal of promoting sustainable development."  *Robinson Township*, 83 A.3d at 958.  Act 13's declaration of purpose,  58 Pa.C.S. § 3202(1) ("Permit optimal development of oil and gas resources of this Commonwealth consistent with protection of the health, safety, environment and property of Pennsylvania citizens."), and the regulation codified in Section 78a.15(g)(5) (listing optimal development of the gas resources and the property rights of gas owners as factors to be considered before issuing a permit), reflect that goal.

<u>An ejusdem generis analysis is not appropriate</u>

The Commonwealth Court and the MSC both narrowly focus on the language "including, but not limited to" in Section 3215(c) as a basis to conclude that the General Assembly did not authorize the Agencies to add the challenged "public resources" to the list based on the ejusdem generis doctrine. "Under our statutory construction doctrine ejusdem generis ('of the same kind or class'), where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated." *McClellan v. Health Maint. Org. of Pa.*, 686 A.2d 801, 806 (Pa. 1996) (per curiam) (citations omitted).[16] Ejusdem generis, like any other principle of statutory construction, is simply a method employed to ascertain legislative intent. However, the fact that a statute employs language which often justifiably results in using that principle does not mean that it is the appropriate means to determine legislative intent, particularly where, as here, statutory language is clear. As we stated in *Commonwealth v. Sitkin's Junk Co.*, 194 A.2d 199 (Pa. 1963), "the ejusdem generis rule … yields if the result of its application is to arrive at a conclusion 'inconsistent with the manifest intent of the Legislature.'" *Id*. at 203 (internal quotation marks and citation omitted). *See also Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889 (Pa. 2020) ("[W]hile ejusdem generis is a useful tool of statutory construction, such tools are used for the sole purpose of determining the intent of the General Assembly. Ejusdem generis must yield in any

---

[16] The doctrine also applies to situations where the generic words precede the list. "Where the opposite sequence is found, i.e., specific words following general ones … the doctrine is equally applicable, and restricts application of the general term to things that are similar to those enumerated." *McClellan*, 686 A.2d at 806.

instance in which its effect would be to confine the operation of a statute within narrower limits that those intended by the General Assembly when it was enacted.").

We find that ejusdem generis plays no role in the statutory analysis. In ascertaining legislative intent, we always start with the plain text. "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). The plain text "including, but not limited to" language does not define "public resources." Instead, it lists the public resources for which the Agencies **must** develop regulatory criteria. The "including, but not limited to" language clarifies that the General Assembly did not intend to limit the Agencies' powers to only those public resources.

The Commonwealth Court's ejusdem generis analysis is myopic because it asks whether the additional "public resources" as defined by the Agencies could fit within the six statutory items codified at Section 3215(c)(1)–(6). This analysis would perhaps be controlling if the term "public resources" did not already carry a legally significant meaning.[17] *See* 1 Pa.C.S. § 1903(a) (explaining that courts must construe "technical words and phrases and such others as have acquired a peculiar and appropriate meaning … according to such peculiar and appropriate meaning or definition"). Here, as the Commonwealth Court correctly recognized, "public resource" derives from the ERA. As a result, an ejusdem generis analysis is misplaced.

---

[17] Because we find that the application of the ejusdem generis principle is not appropriate, we express no view on whether the Commonwealth Court's ejusdem generis analysis of Section 3215 is correct.

We further highlight that in *Department of Environmental Protection v. Cumberland Coal Resources, LP*, 102 A.3d 962 (Pa. 2014), we summarized the conditions that justify using ejusdem generis to discern legislative intent:

> In sum, the presence of such a term as "including" in a definition exhibits a legislative intent that the list that follows is not an exhaustive list of items that fall within the definition; yet, any additional matters purportedly falling within the definition, but that are not express, must be similar to those listed by the legislature and of the same general class or nature.

*Id*. at 976.

This is not a situation where Section 3215(c) can plausibly be interpreted as a definitional section because "public resources" already has a defined meaning within the statutory framework of the Oil and Gas Act:  public resources as understood by the ERA. The statutory language demands that regulatory criteria be developed regarding at least the six specific "public resources" that could be impacted by a proposed well.  The insertion of the "not limited to" language ensured that the Agencies, in their discretion, could determine that other "public resources," as contemplated by the ERA, warranted the same treatment.

In discerning legislative intent, it is important to recognize that the conferral of legislative power here authorizes the Agencies, charged with regulating the unconventional gas well industry, to adopt regulations to do so.  Had the General Assembly wished to impose stricter limits on the Agencies, the language "included, but not limited to" could have been eliminated.[18]  The Legislature knows "to speak in plain

---

[18] In this regard, we note that when analyzing "species of special concern[,]" the Commonwealth Court applied ejusdem generis to determine "whether the regulatory term (continued…)

terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington v. F.C.C.*, 569 U.S. 290, 296 (2013). Here, the General Assembly spoke capaciously.

For these reasons, we conclude that the plain text signals the intent to confer the Agencies with the legislative power to protect additional "public resources" at their discretion. *See Robinson Township*, 83 A.3d at 955 (stating that the drafters of the second clause of the ERA "seemingly signaled an intent that the concept of public natural resources would be flexible to capture the full array of resources implicating the public interest, as these may be defined by statute or at common law"). The General Assembly simply chose to let the Agencies, in the field of their subject-matter expertise, define those additional resources when regulating this industry.[19]

Because the term "public resource" is rooted in the ERA, we hold that the proper test is whether the items chosen by the Agencies fall within the ERA's conception of a "public resource." Here, all three do.

---

'species of special concern' is of the same general nature or class as the statutory items listed." *Marcellus Shale Coalition*, 193 A.3d at 473. The "statutory items listed" for that purpose were "rare and endangered flora and fauna and other critical communities." 58 Pa.C.S. § 3215(c)(4). The ejusdem generis analysis thus asked if the General Assembly intended for "other critical communities" to fit **within** Section 3215(c)(4). Yet, even if the "included, but not limited to" language was eliminated, the Agencies would still be entitled to protect "other critical communities." This illustrates that the ejusdem generis analysis is misplaced because we are not addressing a statute that purports to define a term.

[19] As a result, in the Oil and Gas Act, the General Assembly did not delegate the power to define "public resources" for every conceivable purpose. Instead, the Agencies' definitions are limited to the regulatory scheme at issue.

## C.

### "Other critical communities" as a public resource

### 1.  Analysis of regulatory language

"Other critical communities" is defined as follows:

> (i) Species of special concern identified on a PNDI receipt, including plant or animal species:
>
>> (A) In a proposed status categorized as proposed endangered, proposed threatened, proposed rare or candidate.
>>
>> (B) That are classified as rare or tentatively undetermined.
>
> (ii) The term does not include threatened and endangered species.

25 Pa. Code § 78a.1.

Plants or animal species that meet the (i)(A) or (B) criteria are "public resources" as contemplated by the ERA.  It is understandable that the Agencies would proceed with caution with plants or animal species that are already at risk.[20]  We stated in *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 255 A.3d 289, 310 (Pa. 2021), that the ERA "unmistakably conveys to the Commonwealth that when it acts as a trustee

---

[20]   The Commonwealth Court observed that by excluding "threatened species" the Agencies' regulation "is illogical and seems contrary to the intention of the General Assembly to protect at risk species."  *Marcellus Shale Coalition*, 193 A.3d at 475 (emphasis omitted).  Aside from the fact that the purported illogical nature of a regulation speaks to whether the regulation is reasonable and not whether it was statutorily authorized, the Commonwealth Court overlooked that other portions of the regulations already extend protections to threatened and endangered species.  First, the definitions section separately defines "threatened or endangered species," and thus the definition merely clarifies that the two definitions refer to different things.  Second, the Section 78a.15 regulations require that a "well permit application must include a detailed analysis of the impact of the well, well site and access road on threatened and endangered species[.]"  25 Pa. Code § 78a.15(a).

it must consider an incredibly long timeline and cannot prioritize the needs of the living over those yet to be born." We held that the current citizens and the generations yet to come are "simultaneous beneficiaries" who are entitled to "the conservation and maintenance of the public natural resources." *Id*. at 311. A species that is presently in a proposed state of risk could be thrust into further jeopardy by nearby unconventional well development. We do not agree with the Commonwealth Court's notion that the Agencies were required to wait until a species reaches an even higher threat threshold as a prerequisite to protection where the interest of future generations of citizens must be considered.

## 2. Documents Law

We further scrutinize this portion of the regulations given the Commonwealth Court's conclusion that it violates the Documents Law. Importantly, the intermediate court did not conclude that the Agencies generally failed to follow the public notice requirements of the Documents Law in promulgating the various regulations at issue in this case. Rather, the court held (and the MSC argues) that, because the regulatory definition of "other critical communities" includes the utilization of PNDI receipts and because third-party agencies regularly supplement the PNDI database without the changes being vetted by the formal rulemaking functions, the definition runs afoul of the Documents Law's requirement that an agency must give public notice of its intention to amend a regulation. *See* 45 P.S. § 1201 (stating that an agency must give "public notice of its intention to promulgate, amend or repeal any administrative regulation").

By way of background, the Department's sister agency, the Department of Conservation and Natural Resources ("DCNR"), is statutorily required:

> [t]o undertake, conduct and maintain the organization of a thorough and extended survey of this Commonwealth for the purpose of inventory, survey and elucidation of the ecological resources of this Commonwealth, to gather and digest information from sources within and outside this Commonwealth and to put the results of the survey into a form convenient for reference. The ecological survey should identify the significant natural features of this Commonwealth and the species which comprise these features.

71 P.S. § 1340.305(a)(10). The DCNR fulfils its obligations in this regard by, inter alia, maintaining the PNDI database through the Pennsylvania Natural Heritage Program ("PNHP"). *See generally* PNHP website at https://www.naturalheritage.state.pa.us (last visited Feb. 23, 2023). The Department, in turn, "requires applicants for most permits throughout Pennsylvania to utilize PNHP's [PNDI] database, accessible through the online Conservation Explorer." *Id.* at https://www.naturalheritage.state.pa.us/methodology.aspx (last visited Feb. 23, 2023). Indeed, the Department generally "uses PNDI as the primary source of information during the permit review process for the protection of threatened and endangered or species of special concern." *Id.*

With this background in mind, we reject the Commonwealth Court's holding that the inclusion of the PNDI process in the regulatory definition of "other critical communities" amounts to a continuing, de facto amendment of the regulation, exposing it to endless public notice requirements. To be clear, our case law prohibits an agency from regulating by creating binding norms through procedures, such as issuing statements of policy, that evade the public notice requirements of the Documents Law. *See*, *e.g.*, *Lopata v. Com., Unemployment Comp. Bd. of Review*, 493 A.2d 657 (Pa. 1985) (concluding that a Bureau of Unemployment Compensation bulletin was invalid because it did not simply offer

generalized guidelines or articulate statements of policy; rather, the bulletin amounted to a binding rule of law that failed to conform to the requirements of the Documents Law). That is not what occurred in the instant matter.

There is no dispute that the identification of species of special concern by way of a PNDI receipt was included in the regulatory definition of "other critical communities" when the regulations proceeded through the formal rulemaking procedures. The Agencies did not alter the manner in which that well-established process works. Instead, the Agencies gave appropriate public notice of the manner in which species of special concern were to be identified for purposes of information gathering in the pre-permitting stages of unconventional oil and gas wells. While the PNDI receipt information may vary by site and over time, the basis for inclusion in the statutorily mandated database does not. It would indeed be illogical to require an inventory of the special ecological features of our Commonwealth but prohibit the Department from referencing it when considering permit applications. We, therefore, hold that the Commonwealth Court erred by concluding that the regulatory definition of "other critical communities" violates the Documents Law.[21]

---

[21] In his Concurring and Dissenting Opinion ("CO/DO"), Justice Wecht concludes that the regulatory definition of "other critical communities" "is contained in a regulation that was properly promulgated." CO/DO at 4. The CO/DO, however, disagrees with our conclusion that the Commonwealth Court erred by holding that this definition violates the Documents Law. *Id.* at 22-25. In so doing, the CO/DO relies on an analogy to this Court's decision in *Protz v. Workers' Compensation Appeal Board (Derry Area School District)*, 161 A.3d 827 (Pa. 2017), in which we enforced the Pennsylvania constitutional requirement that the Commonwealth's legislative powers rest exclusively in the General Assembly. *See* PA. CONST. art. II, § 1 ("The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives."). Justice Mundy reaches a similar conclusion in her Dissenting Opinion, wherein she asserts that the regulatory definition of "other critical communities" (continued…)

## D.

### "Common areas of a school's property" and "playgrounds" as a public resources

"Common areas of a school's property" and "playgrounds" likewise qualify as public resources as contemplated by the ERA. As the Agencies explained, these items were not initially included but were added after receiving public commentary. Agencies' Brief at 52. The Agencies decided to promulgate the definition because they "are frequently used for outdoor recreation, similar to parks." *Id.*

Unadulterated outdoor recreation space is a basic component of quality of life and encompassed in the broadly defined values of the environment protected by the ERA. An unconventional gas well near spaces used by the public for recreational purposes could threaten the ambient air quality and cause significant noise pollution. *See Robinson Township*, 83 A.3d at 937–38 (recounting an affidavit of homeowner living approximately 1,500 feet from drilling operations; "traffic caused significant noise pollution … Air quality also became degraded, beginning 'to smell of rotten eggs, sulfur, and chemicals'"); *id*. at 1005 ("As Challengers duly note, these industrial-like operations include … noise from the running of diesel engines, sometimes nonstop for days, traffic from construction vehicles, tankers, and other heavy-duty machinery, the storage of hazardous materials,

---

violates the Documents Law because the PNDI "database of resources [has] not gone through formal notice and comment rulemaking." Dissenting Opinion at 8.

Here, we are not asked to determine whether the General Assembly improperly delegated lawmaking power nor, in our view, are we tasked with deciding whether the Agencies similarly violated some corollary tenet applicable to state agencies. Rather, this appeal requires us to examine whether the Commonwealth Court erred by finding that the regulation at issue violated the Documents Law. We respectfully submit that our straightforward application of the explicit requirements of the Documents Law demonstrates that the Commonwealth Court erred by finding that the regulatory definition of "other critical communities" violates the Documents Law.

[and] constant bright lighting at night[.]") (Baer, J., concurring). Whether those environmental effects are present in any given drilling operation is not relevant. The point is simply that the Agencies' decision to account for those concerns in deciding whether to grant a permit near sites where the public engages in recreational activity is consistent with legislative intent.

**E.**

**_Eagle Environmental_**

Finally, we agree with the Agencies that _Eagle Environmental_ supports our determination that these regulations are valid products of legislative rulemaking and must be afforded a high degree of deference. In _Eagle Environmental_, the Board adopted a "harms/benefits test" as part of the permitting process for waste disposal facilities pursuant to the Solid Waste Management Act ("SWMA"). That test applied after a finding that mitigation measures for environmental harms were adequate, as the applicant then was required to "demonstrate that the benefits of the project to the public clearly outweigh the known and potential environmental harms." _Eagle Environmental II, L.P. v. Dep't of Env't Prot._, 884 A.2d 867, 871 (Pa. 2005). One of the issues presented was whether the agency had the power to dictate the harms/benefits test. The challengers argued that "if the legislature intended to impose [the test], it would have done so in clear and unmistakable language as in other statutes." _Id_. at 876–77. The Court concluded that the agency properly enacted the harms/benefit test. In so doing, we recognized that "the overriding goal of the SWMA and Act 101 was to establish a comprehensive state and local solid waste management program, involving permits for disposal facilities, which

would provide the necessary disposal facilities and also protect the environment and the public … while encouraging conservation and recycling." *Id*. at 878.

The harms/benefits test at issue in *Eagle Environmental* shares some key similarities with the definitions of "public resource" challenged by the MSC. While the MSC attacks each regulation separately, the overall thrust of its argument is that the Agency is imposing more regulatory obstacles to securing an unconventional gas well permit than the General Assembly envisioned. The harms/benefit test was similarly criticized: "In regard to the argument that Article I, Section 27 provides authority for the Harms/Benefits Test, Appellants assert that no further balancing is required in that the legislature made the basic policy choice of balancing the potential impact of landfills on the public's health and safety and the environment with the need for waste disposal facilities by requiring compliance with engineering principles and environmental standards." *Id*. at 877. We disagreed, concluding that the test "allows for the infinite variations of factors and considerations which will present themselves in various petitions for permits." *Id. at* 879. We concluded that the agencies were authorized to enact the regulations even absent any reference to the ERA.

The MSC's attempts to distinguish *Eagle Environmental* are unconvincing. It first argues that the Agencies cite *Eagle Environmental* as establishing "a narrower statement of the necessary evaluation of statutory authority, that when determining whether a rulemaking power has been delegated we are not limited to the letter of the law, but must look to the purpose of the statute and its reasonable effect[.]" MSC's Brief at 15 (quotation marks and citation omitted).

The MSC argues that "[t]his framework for statutory analysis must be qualified in at least two ways." *Id*. at 16. The first is that *Eagle Environmental* is factually distinguishable because that case involved waste facilities, which "are of particular concern to communities and are within a highly regulated industry," whereas "oil and gas well sites are not waste facilities but are highly regulated to ensure restoration after construction and strict water handling during operation of the wells." *Id*. The MSC further argues that the statutory schemes are likewise distinguishable. Specifically, the SWMA "contains two express provisions that are not in Act 13." *Id*. Those are a statutory command that its provisions be liberally construed, and statutory provisions regarding economic impacts to communities. "When this Court considered if the harms benefit test created by regulation was within the statutory authority of the SWMA, it looked to these provisions." *Id*. Act 13, however, does not contain either type of provision.

Further, the MSC argues that the second distinguishing feature is that the asserted regulatory power in this case is more doubtful than the power wielded in *Eagle Environmental*.

> Second, the legislature's delegation of rulemaking power must be "clear and unmistakable" because a "doubtful power does not exist." *Gilligan v. Pa. Horse Racing Comm'n*, 422 A.2d 487, 490 (Pa. 1980); *Green v. Milk Control Comm'n*, 16 A.2d 9, 9 (1940). Rather than assuming that all agency regulation is authorized if it is directed to the general purpose of the statute, this latter principle must apply here because the plain language of the statute precludes the claimed authority to adopt the new public resource definitions.

*Id*. at 17.

We are not persuaded by either distinction. Beginning with the industries at issue—waste facilities versus oil and gas drilling—it is obvious that both industries are "of

particular concern" to their local community, and to those in proximity of the drilling activities, unconventional oil and gas wells seem to raise as at least as many concerns as landfills. Additionally, it is illogical to conclude that an agency authorized to regulate the industry cannot regulate because the General Assembly has already regulated the matter. That would be true if the statutory text foreclosed the assertion of the authority, but it does not.

Indeed, the General Assembly chose to bestow regulatory authority upon the Agencies in the first place, and agencies are given that authority precisely because some issues are so highly complex and technical that the legislative branch approves of the agency addressing the complexities. When reviewing agency action, the expertise of the agency is a consideration in determining whether the General Assembly intended for the agency to act. *Cf. Barnhart v. Walton*, 535 U.S. 212, 222 (2002) (holding that *Chevron* applies due to "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question"). The Agencies possess that expertise, and the lengthy notice-and-comment period, which included over 28,000 public comments for the Agencies' consideration and the long review process following those comments, indicates that the process worked exactly as the General Assembly intended. As the *Chevron* Court remarked, agencies may "resolv[e] the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities." *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 865–66 (1984). We find that is the case here. The General Assembly

intentionally permitted the Agencies, which possess the requisite subject-matter expertise, to identify additional public resources in need of consideration. Similarly, as in *Eagle Environmental*, the "infinite variations of factors and considerations" were understandably left to the Agencies to sift through.

We are also persuaded that the General Assembly intended for the Agencies to enact these regulations because there is no "mismatch" between the Agencies' asserted power and the statutory scheme. That concept serves to distinguish cases that the MSC relies on to establish that the Agencies exceeded their statutory authorization, such as *Deoria* and *Insurance Federation of Pennsylvania.*

*Deoria* involved the State Athletic Commission ("SAC"). *Deoria v. State Athletic Comm'n*, 962 A.2d 697 (Pa. Commw. 2008). The SAC is required by law to approve contracts between a boxer and the manager. The SAC approved a contract between Harry Yorgey and his manager James Deoria. About two years later, the parties had a contractual dispute over Yorgey's fight schedule. Deoria and Yorgey met with the executive director of the SAC to discuss the dispute. The director upheld the contract, finding that Doeria did not breach its terms.

At Yorgey's request, the full SAC held a hearing. The Commission "affirmed the decision of the Executive Director to the extent that the contract remains in effect in substantial part. However, the Commission modified the second and fifth provisions of the contract[.]" *Id.* at 699. The Commonwealth Court ultimately agreed with Deoria that the Commission had no authority under the Boxing Act to resolve contract disputes. The court found that the Boxing Act authorized the Commission to "govern[ ] the form, content and ultimate approval of boxer-manager contracts," but it conferred no authority to

adjudicate contractual disputes. *Id.* at 701. The panel determined this was a "jurisdictional" issue.

> Despite these enumerated powers and duties, the Boxing Act is silent with regard to the Commission's jurisdiction to resolve or arbitrate contractual disputes. While contracts are subject to the approval of the Commission, neither the Boxing Act nor the rules and regulations of the Commission governing boxing give the Commission explicit or implicit jurisdiction or authority to resolve contractual disputes between boxers and managers. Pursuant to the Boxing Act, the only express authority for Commission hearings is in connection with a recommendation by the executive director regarding the suspension or revocation of a permit or license.

*Id*.

*Deoria* is a clear example of an agency straying from its statutory authority. The General Assembly enumerated specific powers and duties, but the relevant statutory conferrals of legislative rulemaking were "silent with regard to the Commission's jurisdiction to resolve or arbitrate contractual disputes." *Id.* Notably, the *Deoria* Court addressed whether the SAC possessed "explicit or implicit jurisdiction or authority to resolve contractual disputes between boxers and managers." *Id*. The statutory text did foreclose that assertion of authority because it did not give the SAC the power to resolve contractual disputes. Additionally, there is little reason to think that the General Assembly intended for an agency to resolve contractual disputes, which requires answering a question of law. The SAC strayed far outside its wheelhouse in aggrandizing the power to determine legal contractual disputes. The same cannot be said of the Agencies' regulations here. There is an obvious mismatch in having the SAC resolve questions of law that are not present in this case. The regulatory decisions made by the Agencies are squarely within their subject-matter expertise.

In *Insurance Federation of Pennsylvania,* this Court determined that the Department of Insurance exceeded its regulatory authority. *Ins. Fed'n of Pa. v. Dep't of Ins.*, 889 A.2d 550 (Pa. 2005). The dispute started when Liberty Mutual Insurance Company filed a proposed revision to its private passenger insurance policies seeking to eliminate arbitration for uninsured and underinsured motorist claims. The Insurance Department rejected the policy and determined that arbitration is required. The Insurance Federation of Pennsylvania filed a petition for declaratory judgment. This Court determined that the Insurance Department could not demand arbitration. As sources of legislative rulemaking authority, the opinion stated that the General Assembly requires all non-exempt vehicles to carry insurance, and, pursuant to the Insurance Department Act, requires all policies to be approved by the Insurance Commissioner. Additionally, the Uninsured Motorist Act requires all policies to include provisions for uninsured motorist coverage unless rejected by the insured, and in 1984, the Motor Vehicle Financial Responsibility Law set standards for what must be included in insurance policies, including the requirement that uninsured and underinsured motorist coverage provisions must be offered (even if they could be waived). Taken together, these laws require that "a policy must include a provision for [uninsured] and [underinsured] insurance in order to be approved by the Insurance Commissioner." *Id*. at 554.

These statutes did not expressly grant the Insurance Department with the authority to require mandatory binding arbitration. Thus, the Court asked "whether the Insurance Department has the implied authority" to promulgate that regulation. *Id.* The Commonwealth Court accepted the Insurance Commissioners' conclusion that the Motor Vehicle Financial Responsibility Law declared a public policy that arbitration is the fastest

and least expensive method of accomplishing the goal of aiding innocent victims. *Id*. (stating that the panel "deferred to the Insurance Commissioner's expertise"). This Court, however, did not specifically pass on that judgment. "Salient or not, the public policy … does not create an implied legislative mandate allowing the Insurance Department to change the normal course of judicial proceedings simply because arbitration is less costly and less time-consuming than traditional litigation." *Id*. at 555. The Court determined that there was no "substantive provision of the law" requiring mandatory binding arbitration. As a result, the agency "overstepped its legislative mandate." *Id*.

The *Insurance Department* decision is about implicit authority. As we have explained at length, the specific statutory authorizations within Section 3215 grant the Agencies power to expand the list of "public resources." This is therefore a case of how far the Agencies may go, whereas *Insurance Department* is about whether the Agencies could address the subject matter at all.[22]

---

[22] The MSC also cites *Rand v. Pennsylvania State Board of Optometry*, 762 A.2d 392 (Pa. Commw. 2000), as a case establishing that an agency must be clearly authorized to wield a specific power. That case is readily distinguishable. There, optometrist Lawrence Rand completed a course in 1987 for prescribing therapeutic agents while in optometry school. In 1999, he applied to the Pennsylvania State Board of Optometry ("PSBO") for a certificate to administer therapeutic agents. The PSBO had promulgated regulations stating that an applicant could not do so unless he or she obtained their optometry license on or after April 1, 1993. It therefore denied his application. Rand appealed, claiming that the PSBO lacked authority to promulgate that regulation because the relevant statute did not authorize it.

The Commonwealth Court agreed and struck the regulation as exceeding the agency's legislative powers. The Commonwealth Court observed that the April 1, 1993 "is a date frozen in time." *Id*. at 395. As a result, the "regulation does nothing to advance the intent of the Act, which is to ensure the optometrists' knowledge regarding pharmaceutical agents is current." *Id*. We are not bound by *Rand*, and its criticisms appear to be directed at the reasonableness of the chosen date. *See Slippery Rock Area Sch. Dist. v. Unemployment Comp. Bd. of Rev.*, 983 A.2d 1231, 1242 (Pa. 2009) (stating that a regulation is not reasonable if it is "so entirely at odds with fundamental principles as to (continued…)

We thus reject the assertion that *Eagle Environmental* permits courts to engage in a "narrower evaluation" of statutory authority. The question is always whether the agency has exceeded its authority. *Eagle Environmental*, like this case, required a determination of whether the General Assembly intended for the agency to have the asserted power. Context matters, of course, but there is no "narrower" or "looser" evaluation. The absence of a provision demanding that the Oil and Gas Act be construed in a liberal manner is simply one factor in the contextual analysis, which here includes consideration of the express guarantees of the ERA.

Similarly, our conclusion that the Agency has statutory authorization to identify these three "public resources" respects legislative intent. Determining whether the three additional items are valid would require the balancing of competing policy concerns, a task that courts are ill-equipped to do. Consider the Commonwealth Court's conclusion regarding the definition of "other critical communities." The panel stated that its "interpretation is logical when one considers the purpose of Act 13 and the balance that must be struck between oil and gas and environmental interests." *Marcellus Shale Coalition*, 193 A.3d at 475. Aside from the fact that this analysis is misplaced in the context of a plain language statutory analysis (because it cites factors that apply only when the words of the statute are not explicit, *see* 1 Pa.C.S. § 1921(c)(1) (permitting a court to examine the "occasion and necessity for the statute")), the goal of striking a balance between industry and the environment was intentionally left in the hands of the

---

be the expression of a whim rather than an exercise of judgment"). In any event, the case is not comparable to this dispute because the Commonwealth Court did not conclude that the PSBO was powerless to devise regulations to ensure that optometrists' knowledge remained current.

Agencies. By attempting to determine whether the regulations promote the Oil and Gas Act's balancing, the court assumed a power that was entrusted to the Agencies in their expertise. For all the foregoing reasons, we conclude that the three challenged regulations do not exceed the Agencies' statutory authorizations.

**F.**

**Reasonableness**

The question remains whether the three regulatory definitions are reasonable. In *Pennsylvania Human Relations Commission v. Uniontown Area School District*, 313 A.2d 156 (Pa. 1973), we set forth the following points of law.

> A court, in reviewing such a regulation, 'is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers. To show that these have been exceeded in the field of action . . . involved, it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be 'so entirely at odds with fundamental principles . . . as to be the expression of a whim rather than an exercise of judgment.'

*Id*. at 169 (quoting *Am. Tel. & Tel. Co. v. United States*, 299 U.S. 232 236–37 (1936)).

The Commonwealth Court's belief that the regulations "upset[ ] the balance between industry and the environment" is just an alternative way of saying that they are "unwise or burdensome or inferior to another." *Marcellus Shale Coalition*, 193 A.3d at 476. That weighing is for the agencies, not the courts. We may strike the regulations only if they are fundamentally at odds with the statutory scheme. These are not. The statutory conception of "public resources," with its link to the ERA, demonstrates that these definitions are reasonable.

Moreover, as stated in *American Telephone & Telegraph*, courts must pay attention to what the regulations are designed to promote. *Am. Tel. & Tel.*, 299 U.S. at 237. Here, these three regulations only serve the Agencies' information gathering requirements and simply require the applicants to submit more information if the proposed well "may impact" those public resources. That additional information has an obvious connection to the Agencies' unquestioned power to issue permits. The goal it seeks to achieve is to allow the Agencies to make a more reasoned determination of whether, or under what, if any, conditions, the permits should issue. The regulations are not designed to interfere with the development of unconventional gas well sites.

The MSC's primary argument attacking the reasonableness of these definitions, particularly the "other critical community" definition, is that those definitions are "an expression of whim for the Agencies to define critical communities to include non-listed special concern species." MSC's Brief at 45. Their arguments simply repackage the assertion that the Agencies lacked statutory authority to promulgate the regulations. *Id.* at 47 ("Distorting the statute to claim authority for the protection of non-listed species that clearly are not on par with rare and endangered species upsets the very balance the General Assembly established between development and environmental protection."). These arguments are invitations to courts, under the guise of a reasonableness analysis, to balance those objectives ourselves. If the General Assembly wishes to curtail the Agencies' powers in this regard, it can clearly do so by removing the Agencies' ability to add "public resources" to the list.

Finally, the MSC agrees with the Commonwealth Court that the regulation concerning schools and playgrounds is unreasonable because, for example, "the list of

schools is seemingly endless as any institution providing some form of educational services would ostensibly qualify as a 'school' under the regulatory definition." MSC's Brief at 25. The Agencies, however, accurately highlight that the list is not endless, a "permit applicant seeking to drill a new unconventional well[] need only look 200 feet from the proposed limit of disturbance of a nearly five acre well site to see whether a neighboring feature may fit the definition of a 'playground' or 'common area' of a school that is open to the public." Agencies' Brief at 57. We are persuaded by the Agencies' position that ascertaining whether these features are within the small-scale boundaries of a proposed new unconventional well is not nearly as burdensome as the Commonwealth Court has suggested. In fact, the burden borders on de minimis.

## G.

## "Playground owners" as a "public resource agency"

The second issue is whether the Agencies were permitted to include a "playground owner" as a "public resource agency." Unlike the designation by the Agencies of additional public resources, there is no specific statutory provision concerning "public resource agencies." As a result, the generic rulemaking authorization becomes pertinent.

The Commonwealth Court concluded that the Agencies lacked statutory authorization to include "playground owners" as a valid "public resource agency," in part because entities that manage playgrounds are not "agencies" in the traditional understanding of the term. That is correct, but irrelevant. The fact that the Agencies chose to use the term "public resource agency" and included private actors within that definition is perhaps a less than optimal choice, but the label attached makes no difference in terms of agency authority.

The MSC additionally submits that these definitions lack statutory authorization because "[o]ne cannot argue that a swing set in a public area of a residential neighborhood or on a school playground is natural or is similar to historic sites listed by state and federal agencies. Playgrounds may be community recreational assets, but they are not managed to ensure conservation of natural resources." MSC's Brief at 23–24. This again is an inaccurate and misplaced ejusdem generis argument, ignoring the value of unadulterated outdoor recreation opportunities.

In addition to our general rejection of the ejusdem generis tool, its use is even more inappropriate here because there is no specific statute addressing public resource agencies. Indeed, the MSC does not challenge the balance of the regulatory provision, which lists specific governmental agencies like the United States Fish and Wildlife Service as a "public resource agency." Thus, our determination that a "playground" is a valid public resource effectively resolves this legal challenge because the "owner" of that resource is responsible for it.

The MSC additionally agrees with the Commonwealth Court that "playground owners" are not trustees and, therefore that Agencies lacked statutory authority to "elevate" their status. *See Marcellus Shale Coalition,* 193 A.3d at 485 ("The Agencies have no authority to elevate private entities as public agencies responsible for ensuring the public trust."). This fundamentally misconstrues what the regulation does. The Agencies are not elevating "playground owners" to trustee status. Instead, the Agencies, as trustees themselves, have determined that it is appropriate in discharging their regulatory duties to seek the input of certain actors when a well may affect the regulated public resources. In the absence of specific limitations on the Agencies' authority in this

regard, we conclude that the general conferral of rulemaking authority provides a valid statutory source for this regulation. *See generally Eagle Environmental*, 884 A.2d 867. Accordingly, we find that the regulation is both within the statutory regulation and reasonable.

**H.**

**The Section 78a.15(g) regulation**

Lastly, we address the Commonwealth Court's holding that this regulatory provision, which permits commentary from the defined "public resource agencies," is invalid. The Commonwealth Court identified a statutory restriction on the Agencies in Section 3215(d), which states:

> **(d) Consideration of municipality and storage operator comments.--**The department may consider the comments submitted under section 3212.1 (relating to comments by municipalities and storage operators) in making a determination on a well permit. Notwithstanding any other law, no municipality or storage operator shall have a right of appeal or other form of review from the department's decision.

58 Pa.C.S. § 3215(d).

As the court stated, we struck this statute as invalid in *Robinson Township*. However, the basis for doing so was that the statute was not sufficiently deferential to municipality concerns. We described Section 3215(d) as a "further blanket accommodation of industry and development … limit[ing] the ability of local government to have any meaningful say respecting drilling permits and well locations in their jurisdictions." *Robinson Township*, 83 A.3d at 973–74. We declared the subsection unconstitutional for the following reasons:

> Section 3215(d) marginalizes participation by residents, business owners, and their elected representatives with

environmental and habitability concerns, whose interests Section 3215 ostensibly protects. *See* 58 Pa.C.S. § 3202 (Declaration of purpose of chapter). The result is that Section 3215 fosters decisions regarding the environment and habitability that are non-responsive to local concerns; and, as with the uniformity requirement of Section 3304, the effect of failing to account for local conditions causes a disparate impact upon beneficiaries of the trust. Moreover, insofar as the Department of Environmental Protection is not required, but is merely permitted, to account for local concerns in its permit decisions, Section 3215(d) fails to ensure that any disparate effects are attenuated. Again, inequitable treatment of trust beneficiaries is irreconcilable with the trustee duty of impartiality. *See Hamill's Estate,* 410 A.2d at 773; 20 Pa.C.S. § 7773.

Calling upon agency expertise to make permit decisions that comply with the Commonwealth's trustee obligations does not dissipate the structural difficulties with a statutory scheme that fails both to ensure conservation of the quality and quantity of the Commonwealth's waters and to treat all beneficiaries equitably in light of the purposes of the trust.

*Robinson Township*, 83 A.3d at 984.

The Commonwealth Court recognized that the regulations cured the flaw by mandating the Department to consider municipalities' comments. Where the court erred was by finding that *Robinson Township*'s decision obliterated statutory authorization to promulgate regulations regarding municipalities. The general conferral of rulemaking authority is still intact and thus no "additional" authorization is needed. *See Marcellus Share Coalition,* 193 A.3d at 484.

Moreover, even if we accept that Section 3215(d) can be read as a **restriction** on the Agencies' powers, which is a questionable proposition given that *Robinson Township* suggested in dicta that the Department would still be "permitted" to consider municipality commentary, the fact remains that *Robinson Township* determined that the municipalities were not given sufficient say in the process. We fail to see how the General Assembly's

attempt to unconstitutionally limit a municipality's participation can be read to deprive the Agencies of their regulatory powers to provide an opportunity for municipalities to have their concerns considered in the permitting process. Critically, the Commonwealth Court's resolution also risks placing the Agencies in the position of violating their trustee duties. Therefore, as with the previous issue, we find that the Agencies have authority via their general rulemaking powers to enact this regulation. We agree with the Agencies that "Section 78a.15(g), which is authorized by surviving sections of the 2012 Oil and Gas Act … succeeds where Section 3215(d) of the 2012 Oil and Gas Act failed." Agencies' Brief at 66.

## VII. Conclusion

The Commonwealth Court deemed invalid and unenforceable several regulations promulgated by the Agencies that serve primarily to aid the Agencies in information gathering attendant to the issuance of permits for unconventional gas well operations. For all of the reasons set forth above, we find that the Agencies did not exceed their legislative rulemaking powers in enacting the challenged regulations, and so, we reverse the Commonwealth Court's order.

Chief Justice Todd joins the opinion and Justice Dougherty joins Parts I-V and VI(C)(2) of the opinion.

Justice Dougherty files a concurring and dissenting opinion.

Justice Wecht files a concurring and dissenting opinion.

Justice Mundy files a dissenting opinion.

The Late Chief Justice Baer did not participate in the decision of this matter.

Justice Brobson did not participate in the consideration or decision of this matter.